IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATHER CHRISTOPHER HARTLEY<br><br>Movant,<br><br>v.<br><br>FELIPE VICINI LLUBERES, *et al.*,<br><br>Respondents. | Civil Action No. 1:08-mc-00010-RJL |

**SUPPLEMENTAL BRIEF IN SUPPORT OF FATHER HARTLEY'S MOTION TO QUASH NON-PARTY SUBPOENA**

## INTRODUCTION

Father Christopher Hartley, through counsel and appearing specially and solely for the purpose of contesting the subject subpoena, respectfully submits the following points in further support of his Motion to Quash the non-party deposition subpoena issued to him by Respondents Felipe Vicini Lluberes and Juan Vicini Lluberes ("Respondents"). On April 3, 2008, the Court heard oral argument on Father Hartley's Motion to Quash. During that hearing, counsel for Respondents conceded that Father Hartley neither lives nor is employed within 100 miles of the District of Columbia. Accordingly, the sole remaining issue before the Court is whether Father Hartley regularly transacts business in person in the District of Columbia.[1] As discussed below, he does not.

[1] At the conclusion of the April 3, 2008 hearing, the Court invited the parties to submit supplemental briefing by the close of business on Wednesday, April 9, 2008 on the narrow issue of whether Father Hartley "regularly transacts business in person" in the District of Columbia. Fed. R. Civ. P. 45(c)(3)(A)(ii).

## ARGUMENT

Pursuant to Fed. R. Civ. P. 45(c)(3)(A)(ii), "[o]n timely motion, the issuing court must quash or modify a subpoena that requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed or ***regularly transacts business in person***." (emphasis added). Respondents concede, as they must, that the only remaining basis for their subpoena to take Father Hartley's deposition is their contention that Father Hartley regularly transacts business in person in the District. He does not: Father Hartley has been present in person in the District of Columbia on only three occasions – for a total of only five days – in the last twenty years. *See* Jan 26, 2008 Declaration at ¶ 3 (attached as exhibit A). On none of those occasions was Father Hartley in the District of Columbia transacting business. Rather, on two occasions in 2007, he was in the District to meet with federal government officials. *See* Jan 26, 2008 Declaration at ¶ 3.a – 3.b. On a third occasion, in 1988 or 1989, Father Hartley was in the District for one day to teach a class at the Formation House of the Missionaries of Charity. *See* Jan 26, 2008 Declaration at ¶ 3.c. These contacts are simply too thin a reed to compel Father Hartley to appear in the District of Columbia for his deposition.

### I. Father Hartley Has Not Transacted Business in Person in the District of Columbia.

In their various filings and before the Court, Respondents argue Father Hartley's two trips to the District of Columbia in 2007 constituted "transacting business in person" because Father Hartley was allegedly promoting the documentary film "The Price of Sugar." This argument is wrong for at least three reasons.

### A. Father Hartley's Trips To The District Of Columbia In 2007 Were Not For The Purpose of Promoting "The Price Of Sugar."

First, neither of Father Hartley's trips to the District in 2007 involved his "promotion" of the film "The Price of Sugar." Father Hartley's first trip was for one day, June 26, 2007, to meet with various officials at the State Department to discuss his missionary work among sugar cane workers in the Dominican Republic. Respondents argue Father Hartley was also in the District of Columbia during this trip to promote "The Price of Sugar" at the SILVERDOCS Film Festival, held in Silver Spring, Maryland. While Respondents assert that Father Hartley's visit "coincided" with SILVERDOCS, that film festival was actually held from June 12 – 17, 2007, well before Father Hartley's single-day trip to the District on June 26, 2007. *See* Ex. B (SILVERDOCS Film Guide). Respondents' contention that Father Hartley's June 26, 2007 trip was to "promote" "The Price of Sugar" at SILVERDOCS is frivolous.

Father Hartley's second trip to the District in 2007 was for three days, November 13 – 15, 2007, again to meet with government officials to discuss the deplorable working and living conditions in the Dominican Republic's sugar plantations. Specifically, the Congressional Human Rights Caucus invited Father Hartley to attend a Capitol Hill screening of "The Price of Sugar" and to discuss his missionary work among sugar cane workers in the Dominican Republic. *See* Ex. C (Remarks of Father Hartley). While "The Price of Sugar" was also showing at the E Street Theatre in the District of Columbia during this time, Father Hartley did not attend a screening at that theatre or otherwise promote "The Price of Sugar." Simply put, neither of Father Hartley's 2007 trips was to promote "The Price of Sugar." His trips were instead to meet with federal government officials about human rights issues in the Dominican Republic.

### B. Father Hartley Has No Business Interest In "The Price Of Sugar."

Second, Respondents' argument that Father Hartley has a business interest in "The Price of Sugar" is flatly wrong. Despite Respondents' repeated assertions to the contrary, Father Hartley will not receive any profits from that film. Instead, in exchange for his cooperation during the making of the documentary, the producer of "The Price of Sugar" agreed to donate fifty percent of any profits ***to a charity*** designated by Father Hartley. *See* Ex. D (April 21, 2005 agreement) at ¶ 1. However, Father Hartley has never designated such a charity because "The Price of Sugar" has not (and will not) make any profit. Moreover, even if Father Hartley did have a financial interest in "The Price of Sugar," Respondents' argument misses the point. Father Hartley would still not be transacting business in person in the District of Columbia merely because a theatre here decided to screen that documentary.

### C. Father Hartley's Visits To Meet With Government Officials Are Not Instances Of Transacting Business In The District of Columbia.

Third and finally, Respondents' argument that Father Hartley's two trips to the District of Columbia in 2007 to meet with government officials should be construed as transacting business has been rejected on public policy grounds. Courts in the District of Columbia have refused to exercise personal jurisdiction over parties where their contacts with the District relate solely to efforts to meet with or influence federal governmental officials. *See, e.g., Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983) (citing *Environmental Research International, Inc. v. Lockwood Greene Eng.*, 355 A.2d 808, 813 (D.C. 1976). Specifically, these Court have held that such contacts do not constitute "transacting business" under the District of Columbia's long-arm statute. *E.g., United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995). As these Courts have recognized, to consider such contacts as transacting business "would pose a threat to

free public participation in government" and "threaten to convert the District of Columbia into a national judicial forum." *Nartex*, 722 F.2d at 786. A similar harm would ensue if this Court were to consider trips to the District of Columbia to meet with federal officials, such as Father Hartley's 2007 visits, as "transacting business in person" for purposes of Fed. R. Civ. P. 45.[2] Such a finding would, in essence, transform the District of Columbia into a "national deposition forum," with stark implications for businesses and individuals wishing to interact with our federal government.

In short, Father Hartley's two trips to the District of Columbia in 2007 were not for the purpose of "transacting business in person." Indeed, Father Hartley has never "transacted business in person" in the District of Columbia. Standing alone, this is reason enough to quash Respondents' subpoena for Father Hartley's deposition.

## II. Respondents Cannot Show Father Hartley "Regularly" Transacts Business In The District Of Columbia.

Even if Father Hartley's two trips to the District of Columbia in 2007 somehow constituted transacting business in person, which they do not, these minimal contacts are insufficient to constitute "regularly" transacting business in person in the District. Federal courts consistently require much more regular contact with a forum than three trips (for a total of five days) in twenty years before considering a person to "regularly" transact business. Indeed, courts uniformly reject contacts far more numerous than Father Hartley's, as the following examples illustrate:

- *Regents of Univ. of Cal. v. Kohne*, 166 F.R.D. 463, 465 (S.D. Cal. 1996) (cited by Respondents): Ten (10) visits in seven (7) years does not constitute regularly

[2] The standard for quashing a third-party deposition subpoena under Fed. R. Civ. P. 45(c)(3)(A)(ii) is, of course, different and more lenient than that for finding a party is subject to *in personam* jurisdiction in a forum. *E.g.*, *Regents of Univ. of Cal. v. Kohne*, 166 F.R.D. 463, 464 (S.D. Cal. 1996) (discussing differences between jurisdictional analysis and analysis under Fed. R. Civ. P. 45).

transacting business in person, attached as Ex. E;

- *Bostian v. Suhor Indus., Inc.*, Civil No. 07-CV-151, 2007 WL 3005177 at * 1 (N.D. Okla. Oct. 12, 2007): Two (2) visits per year for four (4) years does not constitute regularly transacting business in person, attached as Ex. F;

- *M'Baye v. New Jersey Sports Prod.*, 246 F.R.D. 205, 208 (S.D.N.Y. 2007): Visits totaling 14 – 18 days over a two year period does not constitute regularly transacting business in person, attached as Ex. G;

- *In re Application for Order Quashing Deposition Subpoenas*, Civil No. M8-85, 2002 WL 1870084 at * 2 (S.D.N.Y. Aug. 14, 2002): Four (4) visits in five (5) years does not constitute regularly transacting business in person, attached as Ex. H.

Accordingly, even if Respondents could show Father Hartley's two visits to the District of Columbia in 2007 were for the purpose of transacting business in person, those visits were neither frequent enough nor of sufficient length to constitute "regularly" transacting business in person. As such, pursuant to Fed. R. Civ. P. 45, Respondents' subpoena for Father Hartley's deposition testimony must be quashed.

## CONCLUSION

For the foregoing reasons, as well as those in Father Hartley's other papers in support of his Motion to Quash, the Court should grant Father Hartley's Motion and order Respondents' deposition subpoena quashed.

Respectfully submitted,

Dated: April 9, 2008

By: /s/
Sean M. Hanifin (D.C. Bar No. 358347)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006-1040
Telephone: (202) 662-2000
Facsimile: (202) 662-2190

Attorneys for Movant Father Christopher Hartley

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and complete copy of the foregoing Supplemental Brief in Support of Father Hartley's Motion to Quash Non-Party Subpoena, along with attached exhibits, was served on the following counsel of record on April 9, 2008 via the Court's electronic filing system:

Read K. McCaffrey
Stephen Diaz Gavin
Benjamin G. Chew
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037

*Attorneys for Plaintiffs*

Elizabeth C. Koch
LEVINE SULLIVAN KOCH & SCHULTZ, LLP
1050 17th Street N.W.
Suite 800
Washington, D.C. 20036

*Attorneys for Defendants*

By: /s/
Sean M. Hanifin (D.C. Bar No. 358347)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006-1040
Telephone: (202) 662-2000
Facsimile: (202) 662-2190
Attorneys for Non-Party Father Christopher Hartley

# EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FATHER CHRISTOPHER HARTLEY

Movant,

v.

FELIPE VICINI LLUBERES, *et al.*,

Respondents.

Civil Action No. 1:08-mc-00010-RJL

**DECLARATION OF FATHER CHRISTOPHER HARTLEY**

I declare under penalty of perjury as follows:

1. My name is Christopher Hartley. By vocation, I am a Catholic priest ordained on November 8, 1982.

2. My religious superiors are located in Toledo, Spain. In 2006, I was excardinated from my former diocese in New York and incardinated into the Toledo, Spain diocese. My present assignment in Ethiopia is at the direction of the Toledo, Spain diocese.

3. I have been in the District of Columbia, or within 100 miles of the District of Columbia, on only three (3) occasions in the last twenty years:

a. I was in the District of Columbia for three days, from November 13-15, 2007, for a screening of the documentary film that is the subject of the above-captioned dispute;

b. On or about June 26, 2007, I was in the District of Columbia for one day to attend a meeting at the United States Department of State; and

c. In 1988 or 1989, I was in the District of Columbia for one day to teach at the Formation House of the Missionaries of Charity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 26, 2008.

Father Christopher Hartley

Exhibit A
Page 2

# EXHIBIT  B



Film Guide
Think Deeper
Independent Thinkers Welcome June 12–17, 2007
SILVERDOCS
AFI / DISCOVERY CHANNEL DOCUMENTARY FESTIVAL
Silver Sponsors:
cpb
Comcast
SILVERDOCS.com
AFI Silver
Discovery CHANNEL

OPENING NIGHT

# Think Deeper

**YOU'RE INVITED!** Step inside SILVERDOCS 2007, sit back, and journey to distant lands and surprising places that will expand your view of the world.

The SILVERDOCS 2007 line-up offers an authentic, fresh take on our world. The films represent independent and in-depth perspectives on contemporary issues and highly specific yet universal explorations of the human experience. Music and Politics, Art and the Environment, Faith and War—topics you care about, from filmmakers whose passionate storytelling will transport you and take you inside the stories that matter.

## JOIN US FOR OUR OPENING NIGHT SCREENING AND GALA!

"I think that if songs can help us explore our past and our present, and even speculate about our future, then you and I have a better chance of going out and doing something about our troubles." –**Pete Seeger**

PETE SEEGER: THE POWER OF SONG

**7:30 p.m., Tuesday, June 12**

**Jim Brown**

**USA, 2007, 91 MINUTES**

Pete Seeger's songs of social justice are woven into the fabric of American culture. His music—"If I Had a Hammer," "Where Have All the Flowers Gone," "Turn! Turn! Turn!"—is sung as often by schoolchildren as at peace concerts and environmental rallies. Jim Brown's biography of Seeger encapsulates the social upheavals and transformations of the latter half of the 20th century: from the Red Scare when he was blacklisted to his anti-war activism and through his commitment over the last several decades to a heartfelt environmentalism. Featuring interviews with Bob Dylan, Joan Baez, Bruce Springsteen and many more, the film is a powerful tribute to the "high priest of folk music."

**Performance following the screening and at the gala by The Mammals, featuring Seeger's grandson, Tao Rodriguez-Seeger. Gala reception for pass and ticketholders at Discovery Communications World Headquarters at One Discovery Place, just across the street from the AFI Silver. Come join the celebration of film and folk music!**

FOUNDING SPONSOR

PRIMARY MEDIA SPONSORS

cpb
Corporation for Public Broadcasting

Comcast.

CAPITOL FILE
The Gazette

mpt
MARYLAND PUBLIC TELEVISION

Exhibit B
Page 2



# CLOSING NIGHT SCREENING

ARCTIC TALE

**6:30 p.m., Saturday, June 16**

**Sarah Robertson, Adam Ravetch**
USA, 2007, 84 MINUTES

ARCTIC TALE is an epic adventure that explores the vast world of the Great North. The film follows the walrus, Seela, and the polar bear, Nanu, on their journey from birth to adolescence to maturity and parenthood in the frozen Arctic wilderness. Once a perpetual winter wonderland of snow and ice, the walrus and the polar bear are losing their beautiful icebound world as it melts from underneath them.

- From National Geographic Films, the producers of MARCH OF THE PENGUINS, and Paramount Vantage, the distributors of AN INCONVENIENT TRUTH
- Narrated by Queen Latifah
- Featuring music by Cat Stevens, Ben Harper, Aimee Mann and The Shins

**Passholders join us for our Closing Night reception in the Cinema Lounge with an after-party at Jackie's Restaurant.**

BRONZE SPONSORS

OFFICIAL SPONSORS

WAMU 88.5 FM
AMERICAN UNIVERSITY RADIO

Exhibit B
Page 3

# 2007 GUGGENHEIM SYMPOSIUM HONORING JONATHAN DEMME

Named for 4-time Academy Award®–winning filmmaker Charles Guggenheim, the Symposium honors a filmmaker whose work captures current events, frames history and inspires audiences.

**6:30 p.m., Thursday, June 14 at AFI Silver**

The 2007 Guggenheim Symposium commemorates Academy Award–winning director Jonathan Demme. Join us for a conversation with Jonathan Demme and special guests.

Demme's documentary oeuvre includes NEIL YOUNG: HEART OF GOLD (2006), STOREFRONT HITCHCOCK (1998), COUSIN BOBBY (1992), SWIMMING TO CAMBODIA (1987) and STOP MAKING SENSE (1984). His 2003 documentary THE AGRONOMIST, the story of Haitian journalist and human rights activist Jean Dominique, received the 2004 IFP Gotham Award for Best Documentary.

Demme is currently at work on a new documentary, HE COMES IN PEACE, following former United States President Jimmy Carter across the US as he promotes his controversial book *Palestine: Peace Not Apartheid*.

More information: **1.877.DOCS.TIX**

THEATRICAL WORLD PREMIERE

## NEW HOME MOVIES FROM THE LOWER NINTH WARD

**Jonathan Demme**
**USA, 2007, 100 MINUTES**

**Thursday, June 14 at 1:00 p.m.**

A socially and economically diverse group of New Orleans residents, many from the Ninth Ward, brave the adversity caused by the 2005 floods.

Q&A WITH DIRECTOR JONATHAN DEMME AFTER THE SCREENING

## FREE OUTDOOR SCREENINGS

Catch two of Demme's essential music documentaries, screening for FREE in the Silver Plaza!

### STOP MAKING SENSE

Jonathan Demme's minimalist and electrifying film of the Talking Heads in concert

### NEIL YOUNG: HEART OF GOLD

The legend onstage with some of America's best roots musicians at Nashville's historic Ryman Auditorium

MAJOR SPONSORS

INDUSTRY SPONSORS

Alpha Cine
American Film Market
IFP
International Documentary Association
Kodak Motion Picture Film
NALIP
One In Ten/Reel Affirmations
Women in Film and Video, DC
Writers Guild of America, west

AFFILIATE SPONSORS

Filmmaker Magazine
Screen International

CBS Outdoor
Izze
Larabar
MS Business Systems
R & R Lighting

Exhibit B
Page 4

## SPECIAL PROGRAMS & EVENTS

FIGHTING CHOLITAS

### FREE LUNCHTIME SHORTS PROGRAM

Come on—take that long lunch! Sample the best short films SILVERDOCS has to offer at 12:00 p.m. on weekdays. Seating is on a first-come, first-served basis.

THE DEVIL CAME ON HORSEBACK

### THE DEVIL CAME ON HORSEBACK

Annie Sundberg, Ricki Stern
USA, 2006, 86 MINUTES

**Wednesday, June 13 at 6:00 p.m.**

A searing exposition of the violence and tragedy of the genocide in Darfur as seen through the eyes of a solitary American witness, Brian Steidle, in his role as military observer with the African Union.

THIS UNCOMPROMISING FILM WILL BE AUGMENTED BY A THOUGHT-PROVOKING DISCUSSION FEATURING THE FILMMAKERS AND PANELISTS FROM THE US DEPARTMENT OF STATE, THE COUNCIL ON FOREIGN RELATIONS, THE INTERNATIONAL CRISIS GROUP AND THE SUDAN DIVESTMENT TASK FORCE.

THE GATES

### THE GATES

Antonio Ferrera, Albert Maysles, David Maysles, Matthew Prinzing
USA, 2007, 95 MINUTES

**Saturday, June 16 at 6:45 p.m.**

It took artists Christo and Jeanne-Claude over 20 years to persuade New York City officials to let them install their "golden river" of fabric gates in Central Park. Renowned filmmaker Al Maysles and Antonio Ferrera chronicled their effort and recorded the glorious installation, covering 23 miles of footpaths.

On Sunday we present a retrospective screening of RUNNING FENCE, directors Al and David Maysles' 1978 documentary about the fabric fence erected by Christo and Jeanne-Claude along 24 miles of California coastline.

CHRISTO, JEANNE-CLAUDE, AND FILMMAKERS IN PERSON

DOUBLETIME

### DOUBLETIME

Stephanie Johnes
USA, 2007, 82 MINUTES

**Saturday, June 16 at 3:00 p.m.**

Competitive fusion double-dutch jump rope combines dance, gymnastics, and acrobatics to a pulsing soundtrack. Two winning teenage teams from the Carolinas prepare and compete for nationals at the Apollo Theater in Harlem—and fight intimidation by the world-class Japanese.

JOIN US FOR A LIVE "PRECISION JUMPROPE" DEMONSTRATION FROM THE KANGAROO KIDS AFTER THE FILM

RUNNING FENCE

### RUNNING FENCE

Albert Maysles, David Maysles
USA, 1978, 58 MINUTES

**Sunday, June 17 at 12:15 p.m.**

CONTRIBUTING SPONSORS

Exhibit B
Page 5

SUPER AMIGOS

## Sterling Feature Competition

### BIG RIG
**Doug Pray**
USA, 2007, 95 MINUTES

Shattering the anonymity of long-haul truck drivers, filmmaker Pray constructs a portrait of working-class America and the diverse individuals whose largely invisible labor drives our economy. Their complex personal histories and perspectives play out against America's iconic "ribbon of highway."

**Thurs. 6/14 at 9:15 p.m.**
**Fri. 6/15 at 6:15 p.m.**

### ENEMIES OF HAPPINESS
**Eva Mulvad, Anja Al-Erhayem**
DENMARK, 2006, 59 MINUTES

The first woman elected to Afghanistan's parliament, Malalai Joya's democratic spirit has made her a heroine to many Afghans. Filmed during the final weeks of her 2005 campaign, when she was under threat of death, the film reveals Joya's courage and the human faces behind the news stories of burqas and blue-inked thumbs.

**Thurs. 6/14 at 7:30 p.m.**
**Fri. 6/15 at 3:15 p.m.**
SPECIAL GUESTS SCHEDULED TO ATTEND ON JUNE 15

### HOTHOUSE
**Shimon Dotan**
ISRAEL, 2006, 89 MINUTES

For the nearly 10,000 Palestinians incarcerated in Israeli prisons—some of whom are failed suicide bombers or those who planned bombers' missions—life behind the walls creates a brotherhood that fuels the political divide.

**Fri. 6/15 at 3:45 p.m.**
**Sat. 6/16 at 6:00 p.m.**

### HOW TO COOK YOUR LIFE
**Doris Dörrie**
GERMANY, 2007, 100 MINUTES

Just as life is a journey, not a destination, food is about the process of cooking, not just eating. This inspiring film follows Zen chef Edward Brown and his good-natured exploration of cooking, life, and the world around us.

**Thurs. 6/14 at 4:00 p.m.**
**Sat. 6/16 at 1:15 p.m.**

### LOSERS AND WINNERS
**Ulrike Franke, Michael Loeken**
GERMANY, 2006, 96 MINUTES

Cultures clash as a Chinese firm buys a giant German steel factory and moves it piece by piece to the other side of the global economy.

**Wed. 6/13 at 5:30 p.m.**
**Sat. 6/16 at 5:30 p.m.**

### MADE IN L.A.
**Almudena Carracedo**
USA, 2007, 70 MINUTES

Latina garment workers expend blood, sweat and tears to successfully organize against not only the sweatshops but the glossy mall stores where the fruits of their labor are displayed.

**Fri. 6/15 at 7:30 p.m.**
**Sat. 6/16 at 12:45 p.m.**

### PLEASE VOTE FOR ME
**Weijun Chen**
CHINA, 2007, 55 MINUTES

How do you build democracy in the world's largest Communist country? Start small, very small. This charming film follows the intense politicking to become class monitor of a third-grade class in Wahun Province.

**Fri. 6/15 at 2:00 p.m.**
**Sat. 6/16 at 1:30 p.m.**

### THE PRICE OF SUGAR
**Bill Haney**
USA, 2006, 90 MINUTES

When a charismatic Spanish Priest arrives in the Dominican Republic and protests the enslavement of dispossessed Haitians in the sugar plantations, he ignites a firestorm of tension.

**Wed. 6/13 at 3:30 p.m.**
**Fri. 6/15 at 11:45 a.m.**

### TAXI TO THE DARKSIDE
**Alex Gibney**
USA, 2007, 106 MINUTES

An examination of torture and the War on Terror, beginning with the death of an innocent Afghani taxi driver. Gibney tracks the development of the Bush administration's interrogation techniques in Afghanistan, Guantanamo and Iraq.

**Fri. 6/15 at 8:00 p.m.**

### A WALK INTO THE SEA: DANNY WILLIAMS & THE WARHOL FACTORY
**Esther B. Robinson**
USA, 2007, 78 MINUTES

This artful inquiry into the mysterious disappearance of the filmmaker's uncle, Danny Williams—a promising young filmmaker and provisional figure in Andy Warhol's inner circle at The Factory—weaves rarely seen footage from the period together with contemporary interviews of surviving Factory members.

**Thurs. 6/14 at 5:00 p.m.**
**Sat. 6/16 at 3:30 p.m.**

## World View

### 14 WOMEN
**Mary Lambert**
USA, 2007, 79 MINUTES

During its entire 218-year history, only 35 of the 1,875 members of the most powerful club in America—the US Senate—have been female. But in 2006, there were 14. 14 WOMEN takes you inside the halls of power and their jam-packed lives.

**Thurs. 6/14 at 7:00 p.m.**
MEMBERS OF THE US SENATE SCHEDULED TO ATTEND

### 4 ELEMENTS
**Jiska Rickels**
NETHERLANDS, 2006, 89 MINUTES

Fishermen, miners, firefighters and astronauts engage the elements in this visually stunning meditation on man's relationship with water, earth, fire, and air. Elegantly constructed, this film envelops the viewer in their experience.

**Preceded by**
**ALICE SEES THE LIGHT**
Ariana Gerstein, USA, 2006, 7 MINUTES

Many Americans live under lights so bright their eyes can no longer adjust to total darkness. An animated ode to the dark.

**Thurs. 6/14 at 11:00 a.m.**

### BANISHED
**Marco Williams**
USA, 2007, 87 MINUTES

The forced expulsion of blacks from entire counties in the American South is a harsh truth of history. Families fled in fear of the Klan, losing their land and insulting their dignity. Now, towns are reluctant to make amends, and the descendents are demanding justice.

**Sat. 6/16 at 8:00 p.m.**
**Sun. 6/17 at 2:00 p.m.**

### BIG DREAMERS
**Camille Hardman**
AUSTRALIA, 2006, 55 MINUTES

The rainiest town in Australia builds the world's largest rubber boot to attract tourists and boost town pride. Tempers flare when everyone thinks they're artists, and a giant frog becomes a point of contention.

**Preceded by**
**THE TRUTH ABOUT TOOTH**
Hazel Baillie, UK, 2007, 10 MINUTES

An insight into the meticulous work of the Tooth Fairy, exploring the importance of myth in escaping the tedium of everyday life.

**Wed. 6/13 at 10:30 p.m.**

### BLACK WHITE & GRAY: A PORTRAIT OF SAM WAGSTAFF AND ROBERT MAPPLETHORPE
**James Crump**
USA, 2007, 75 MINUTES

Wagstaff, an Upper East Side art collector, became a leader of New York's downtown art scene in the 1970s. With exquisite taste and evocative style, he launched the young Mapplethorpe to stardom.

**Sat. 6/16 at 8:30 p.m.**

### CHICAGO 10
**Brett Morgen**
USA, 2007, 103 MINUTES

Brett Morgen mixes original animation, archival footage and a rousing soundtrack to evoke the Chicago Seven Trial of the 1960's, when young Americans confronted their own oppressive and armed government.

**Fri. 6/15 at 8:15 p.m.**

### COMA
**Liz Garbus**
USA, 2007, 100 MINUTES

This "year in the life" of four patients emerging from comas provokes complex questions about defining quality of life but gives tremendous insight into the power of familial love.

**Wed. 6/13 at 4:00 p.m.**
PANEL DISCUSSION FOLLOWING THE FILM

### THE CONSULTATION
**Hélène De Crécy**
FRANCE, 2006, 91 MINUTES

Glimpse the private confines of a French country doctor's consultation room, where diagnoses such as panic attacks, alcohol addiction and schizophrenia reveal the human side of health care.

**Fri. 6/15 at 2:15 p.m.**

### DOES YOUR SOUL HAVE A COLD?
**Mike Mills**
USA, 2007, 82 MINUTES

The Japanese did not have a word for depression until the year 2000, despite having a suicide rate twice that in the US. Now they have antidepressants—and a marketing campaign to sell both the illness and the cure.

**Thurs. 6/14 at 5:30 p.m.**

### THE FIRST SATURDAY IN MAY
**John Hennegan, Brad Hennegan**
USA, 2007, 97 MINUTES

In the high-stakes world of horseracing, the Kentucky Derby is the Holy Grail—but only 20 of the thousands of thoroughbreds born each year make it to Churchill Downs. The filmmakers follow six horses, including the beloved and tragic Barbaro, on the global quest for a spot in the starting gate.

**Sun. 6/17 at 5:30 p.m.**

Exhibit B
Page 6

# FEATURES

## FOREVER
**Heddy Honigman**
NETHERLANDS, 2006, 66 MINUTES

A polgnant meditation on the famous Père-Lachaise cemetery in Paris—eternal resting place of Oscar Wilde, Jim Morrison, Balzac and Chopin—where visitors reconcile human mortality with the immortal power of art.

**Sat. 6/16 at 11:15 a.m.**

## FRANK AND CINDY
**G.J. Echternkamp**
USA, 2007, 73 MINUTES

Director Echternkamp explores unrealized dreams and the complexity of love in this hilarious portrait. Family life gets disturbing when dad was a one-hit-wonder '80s pop star and mom wishes he was so much more.

**Sat. 6/16 at 10:30 p.m.**

## GARBAGE WARRIOR
**Oliver Hodge**
UK, 2007, 88 MINUTES

Rebel New Mexico eco-architect Michael Reynolds' dreams are built with beer cans, tires, and bottles. In the race against global warming, Reynolds learns to work within the system to affect broader change and build his "earthships" all over the world.

**Wed. 6/13 at 8:45 p.m.**

## HARD ROAD HOME
**Macky Alston**
USA, 2007, 74 MINUTES

More than a social services agency, the Exodus Transitional Community in Harlem provides almost-familial support for recent ex-convicts, led by a rehabilitated ex-con who does more than talk the talk.

**Fri. 6/15 at 8:30 p.m.**

## HELVETICA
**Gary Hustwit**
UK, 2007, 81 MINUTES

Swiss design freaks rejoice! Helvetica, the omnipresent and quintessentially "Modern" font inspires passionate devotion and equally fanatical dislike.

**Sat. 6/16 at 9:00 p.m.**

## IN THE SHADOW OF THE MOON
**David Sington**
USA, 2007, 96 MINUTES

The visually stunning story of the men who went to the moon, told in their own words. Heroes then—wise men, now: theirs is the story of an American dream realized for the whole world.

**Fri. 6/15 at 6:00 p.m.**

## JUNGLE RUDY, THE CHRONICLE OF A FAMILY
**Rob Smits**
NETHERLANDS, 2006, 89 MINUTES

Raised in luxury, Rudy turned his back on his fortune, escaped to the Venezuelan jungle, started a family and ultimately launched a tourist camp so successful that he himself had to eventually seek solace...again.

**Sat. 6/16 at 10:45 a.m.**

## LAKE OF FIRE
**Tony Kaye**
USA, 2006, 156 MINUTES

Controversial filmmaker Tony Kaye has created a carefully balanced history of the battle over abortion rights in America and invites reasonable, compassionate debate of this incendiary issue.

**Fri. 6/15 at 11:15 a.m.**

LIVING GODDESS

## MISS GULAG
**Maria Yatskova**
USA, 2007, 70 MINUTES

When the inmates at a Siberian women's prison hold a fashion show, the outrageously colorful outfits they design contrast with the bleakness of their incarceration. Their stories illuminate the bleak prospects available to post-Soviet Russian youth—in and out of jail.

**Thurs. 6/14 at 9:30 p.m.**

## NANKING
**Bill Guttentag, Dan Sturman**
USA, 2007, 89 MINUTES

Western expatriates, businessmen and missionaries, living in the Chinese capitol of Nanking in 1937, risked their lives forming the Nanking Safety Zone to protect innocent Chinese from the invading Japanese army. Their dramatized stories, culled from letters and diaries, emphasize the horrors of war.

**Fri. 6/15 at 5:45 p.m.**

## NO END IN SIGHT
**Charles Ferguson**
USA, 2006, 102 MINUTES

Filmmaker Ferguson connects the dots between the failure to stabilize post-Saddam Iraq and the present insurgency. Interviews with transition team member Colonel Paul Hughes and Washington Post translator Omar Fekeiki illuminate errors in judgment and planning.

**Thurs. 6/14 at 2:15 p.m.**

## OFF THE GRID: LIFE ON THE MESA
**Jeremy Stulberg, Randy Stulberg**
USA, 2007, 64 MINUTES

A liminal community on "the Mesa" lacks modern conveniences like electricity, running water, and police, but provides a haven for outsiders and anarchists, traumatized veterans and teenage runaways.

**Fri. 6/15 at 1:45 p.m.**

## THE RED CARPET
**Andrea Asch, Eric Asch**
GERMANY, 2007, 89 MINUTES

Axel Brauns is a successful author and budding filmmaker. He is also an autistic man who outsmarts his autism daily without fully escaping it—or really wanting to.

**Thurs. 6/14 at 5:15 p.m.**

## SOUVENIRS
**Shahar Cohen, Halil Efrat**
ISRAEL, 2006, 75 MINUTES

When Shahar Cohen hears his 82-year-old father bragging about the "souvenirs" he left behind during WWII, the young filmmaker determines to retrace his father's history in the Jewish brigade, with the hopes of locating his potential half-siblings.

**Thurs. 6/14 at 9:45 p.m.**

## STATE LEGISLATURE
**Frederick Wiseman**
USA, 2006, 217 MINUTES

Master filmmaker Wiseman's latest couldn't be more timely, capturing the inner workings of the democratic process when many of us have campaign fatigue. Aha—this is what democracy looks like!

**Wed. 6/13 at 6:15 p.m.**

## SUPER AMIGOS
**Arturo Perez Torres**
CANADA/MEXICO, 2007, 82 MINUTES

In Mexico City, five real-life "social wrestlers" fight for social justice with custom masks, costumes and attitude. Featuring live action, animation, and a surf soundtrack inspired by mariachi music and Batman.

**Fri. 6/15 at 10:45 p.m.**

## THE THIRD COAST INTERNATIONAL AUDIO FESTIVAL
**Various**
USA, 2007, 75 MINUTES

Documentary film salutes documentary audio! In a darkened theater, listen to the best, the most compelling, the most entertaining documentary programs made for radio and the Internet.

**Thurs. 6/14 at 3:15 p.m.**

## VOYAGE IN G MAJOR
**Georgi Lazarevski**
FRANCE, 2006, 55 MINUTES

90-year-old Aimé leaves his dedicated homebody wife behind to take his dream journey to Morocco, accompanied by his grandson. A bittersweet, poetic, humorous journey of a man who spent a lifetime holding back and can't possibly hold in the sheer joy of finally cutting loose with no compromises.

**Preceded by ANDERMAN**
Jaap van Heusden, NETHERLANDS, 2006, 12 MINUTES

Per Anderman struggles to write, frustrated by caring for his mother. He begins his Alzheimer's Café blog and finds his writing renewed.

**Sat. 6/16 at 4:00 p.m.**

## WAKING APHRODITE
**Sarah Gonser, Lance Kruger**
USA, 2007, 56 MINUTES

Laughter and learning abound when Maggie Tappert, The High Priestess of Pleasure, confronts the disparity between her career teaching women the wonders of sex and her personal life as a grandmother, with an aging husband and a deteriorating body.

**Wed. 6/13 at 10:15 p.m.**

## A WALK TO BEAUTIFUL
**Mary Olive Smith, Amy Bucher**
USA, 2007, 85 MINUTES

Five Ethiopian women suffer from devastating childbirth injuries and make the journey to reclaim their dignity and rebuild their lives.

**Sat. 6/16 at 1:00 p.m.**

## WAR/DANCE
**Sean Fine, Andrea Fine**
USA, 2007, 106 MINUTES

Young people in Northern Uganda's refugee camps have had their childhoods taken away by that country's bitter civil war—but the annual Kampala music competition gives them hope and a positive goal. Will the students from the destitute Patongo refugee camp schools hold their own on the national stage?

**Preceded by I WANT TO BE A PILOT**
Diego Quemada-Diez, KENYA/MEXICO/SPAIN, 2006, 11 MINUTES

Quemada-Diez's poem highlights the desperation felt by AIDS orphans living in the slums of Kenya, and the hopes they have of leaving.

**Thurs. 6/14 at 8:30 p.m.**

## WATER FLOWING TOGETHER
**Gwendolen Cates**
USA, 2007, 58 MINUTES

After a 24-year career with the NYC Ballet, Jock Soto—a Native American and Puerto Rican dancer hand selected for the company by George Balanchine—decides to retire. Juxtapositions of dance with return visits to Soto's Southwest home emphasize how Soto's artistry and heritage are disconnected, yet inextricably intertwined.

**Thurs. 6/14 at 8:00 p.m.**

# FILM GRID

## Tuesday, June 12

| Venue | Time | Film |
|---|---|---|
| THEATER 1 | 7:00 | PETE SEEGER: THE POWER OF SONG OPENING NIGHT SCREENING AND GALA |

## Wednesday, June 13

| Venue | Time | Film |
|---|---|---|
| THEATER 1 | 12:00 | SHORTS 1: SIGHT AND SOUND |
| THEATER 1 | 2:00 | SHORTS 5: LONG DISTANCE |
| THEATER 1 | 5:45 | NOMADS TX |
| THEATER 1 | 8:00 | ORTHODOX STANCE |
| THEATER 1 | 10:10 | STAND UP: MUSLIM AMERICAN COMICS... |
| THEATER 2 | 4:00 | COMA |
| THEATER 2 | 6:00 | THE DEVIL CAME ON HORSEBACK |
| THEATER 2 | 8:45 | GARBAGE WARRIOR |
| THEATER 3 | 1:30 | HIP HOP REVOLUTION |
| THEATER 3 | 3:30 | THE PRICE OF SUGAR |
| THEATER 3 | 6:15 | STATE LEGISLATURE |
| THEATER 3 | 10:15 | WAKING APHRODITE |
| ROUND HOUSE THEATER | 5:30 | LOSERS AND WINNERS |
| ROUND HOUSE THEATER | 8:15 | WE ARE TOGETHER |
| ROUND HOUSE THEATER | 10:30 | BIG DREAMERS With Short TRUTH ABOUT TOOTH |

## Thursday, June 14

| Venue | Time | Film |
|---|---|---|
| THEATER 1 | 12:00 | SHORTS 2: EMBATTLED |
| THEATER 1 | 4:00 | HOW TO COOK YOUR LIFE |
| THEATER 1 | 6:30 | 2007 Guggenheim Symposium Honoring Jonathan Demme |
| THEATER 1 | 8:30 | WAR/DANCE With Short I WANT TO BE A PILOT |
| THEATER 2 | 11:45 | BUDDHA'S LOST CHILDREN |
| THEATER 2 | 2:15 | NO END IN SIGHT |
| THEATER 2 | 5:00 | A WALK INTO THE SEA: DANNY WILLIAMS & THE WARHOL FACTORY |
| THEATER 2 | 7:00 | 14 WOMEN |
| THEATER 2 | 9:15 | BIG RIG |
| THEATER 3 | 11:00 | 4 ELEMENTS With Short ALICE SEES THE LIGHT |
| THEATER 3 | 1:00 | NEW HOME MOVIES FROM THE LOWER 9th WARD |
| THEATER 3 | 3:15 | The Third Coast International Audio Festival |
| THEATER 3 | 6:15 | THE RED CARPET |
| THEATER 3 | 7:30 | ENEMIES OF HAPPINESS |
| THEATER 3 | 9:30 | MISS GULAG |
| ROUND HOUSE THEATER | 1:30 | SHORTS 4: BEYOND BELIEF |
| ROUND HOUSE THEATER | 5:30 | DOES YOUR SOUL HAVE A COLD? |
| ROUND HOUSE THEATER | 8:00 | WATER FLOWING TOGETHER |
| ROUND HOUSE THEATER | 9:45 | SOUVENIRS |
| OUTDOOR VENUES | 9:00 | STOP MAKING SENSE (On the Silver Plaza) |

## Friday, June 15

| Venue | Time | Film |
|---|---|---|
| THEATER 1 | 12:00 | SHORTS 3: YOU & ME |
| THEATER 1 | 1:45 | OFF THE GRID: LIFE ON THE MESA |
| THEATER 1 | 3:45 | HOTHOUSE |
| THEATER 1 | 6:00 | IN THE SHADOW OF THE MOON |
| THEATER 1 | 8:15 | CHICAGO 10 |
| THEATER 1 | 10:30 | AUDIENCE OF ONE |
| THEATER 2 | 11:45 | THE PRICE OF SUGAR |
| THEATER 2 | 2:00 | PLEASE VOTE FOR ME |
| THEATER 2 | 3:15 | ENEMIES OF HAPPINESS |
| THEATER 2 | 5:45 | NANKING |
| THEATER 2 | 8:00 | TAXI TO THE DARK SIDE |
| THEATER 2 | 10:45 | SUPER AMIGOS |
| THEATER 3 | 11:15 | LAKE OF FIRE |
| THEATER 3 | 2:15 | THE CONSULTATION |
| THEATER 3 | 4:15 | SHORTS 2: EMBATTLED |
| THEATER 3 | 6:15 | BIG RIG |
| THEATER 3 | 8:30 | HARD ROAD HOME |
| THEATER 3 | 10:15 | KURT COBAIN ... With Short SONIC YOUTH: "DO YOU..." |
| ROUND HOUSE THEATER | 6:00 | THE MONASTERY |
| ROUND HOUSE THEATER | 7:30 | MADE IN L.A. |
| ROUND HOUSE THEATER | 9:30 | HARD AS NAILS |
| OUTDOOR VENUES | 9:00 | NEIL YOUNG: HEART OF GOLD (On the Silver Plaza) |

Exhibit B
Page 8

## FILM GRID

### Saturday, June 16

**THEATER 1**
- 10:30 SHORTS 1: SIGHT AND SOUND
- 12:45 MADE IN L.A.
- 3:00 DOUBLETIME
- 6:30 ARCTIC TALE
- 9:15 MAKING TROUBLE: THREE GENERATION OF FUNNY JEWISH WOMEN

**THEATER 2**
- 11:00AM LIVING GODDESS
- 1:30 PLEASE VOTE FOR ME
- 3:15 BRIDGE OVER THE WADI
- 6:45 THE GATES
- 9:00 HELVETICA
- 11:00 BUILDING A BROKEN MOUSETRAP With two Shorts

**THEATER 3**
- 11:15AM FOREVER
- 1:15 HOW TO COOK YOUR LIFE
- 3:30 A WALK INTO THE SEA: DANNY WILLIAMS & THE WARHOL FACTORY
- 5:30 LOSERS AND WINNERS
- 8:00 BANISHED
- 10:15 SCOTT WALKER— 30 CENTURY MAN

**ROUND HOUSE THEATER**
- 10:45AM JUNGLE RUDY, THE CHRONICLE OF A FAMILY
- 1:00 A WALK TO BEAUTIFUL
- 4:00 VOYAGE IN G MAJOR With Short ANDERMAN
- 6:00 HOTHOUSE
- 8:30 BLACK WHITE & GRAY: ...
- 10:30 FRANK AND CINDY

### Sunday, June 17

**THEATER 1**
- 12:30 NOTE BY NOTE (THE MAKING OF STEINWAY L1037)
- 3:00 WHAT WOULD JESUS BUY?
- 5:30 THE FIRST SATURDAY IN MAY
- 8:00 TBD: Back By Popular Demand

**THEATER 2**
- 12:00 Sterling Awards Screening
- 2:00 BANISHED
- 4:30 PETE SEEGER THE POWER OF SONG
- 6:45 Audience Award Screening
- 9:15 TBD: Back By Popular Demand

**THEATER 3**
- 11:45 SHORTS 4: BEYOND BELIEF
- 2:15 SHORTS 6: LONG DISTANCE
- 4:15 Music Award Screening
- 7:00 SHORTS 3: YOU & ME
- 8:30 TBD: Back By Popular Demand

**ROUND HOUSE THEATER**
- 12:15 RUNNING FENCE
- 2:30 TBD: BACK BY POPULAR DEMAND

**FILM GRID KEY**

Feature Competition · Feature Film · Shorts Program · Special Program

VOYAGE IN G MAJOR
BANISHED
WAKING APHRODITE
NOTE BY NOTE
FRANK & CINDY
PRICE OF SUGAR

Exhibit B
Page 9

## FEATURES & THEMATIC PROGRAMS

WHAT WOULD JESUS BUY?

### WE ARE TOGETHER
**Paul Taylor**
USA/UK, 2007, 87 MINUTES

Agape orphanage is known as the place where the children sing, not as a struggling home for AIDS orphans. With hope and a strong voice, they overcome obstacles to support their home and are finally rewarded with a fundraising performance by pop stars Alicia Keys and Paul Simon.

**Wed. 6/13 at 8:15 p.m.**

### WHAT WOULD JESUS BUY?
**Rob VanAlkemade**
USA, 2007, 91 MINUTES

The Shopocalypse is coming! Rev. Billy and the Stop Shopping Gospel Choir are on a pilgrimage to Disneyland, preaching the word against overspending.

**Sun. 6/17 at 3:00 p.m.**

SPECIAL APPEARANCE BY REVEREND BILLY AND THE STOP-SHOPPING CHOIR

## Music Documentaries

### BUILDING A BROKEN MOUSETRAP
**Jem Cohen**
USA, 2006, 62 MINUTES

From the acclaimed filmmaker of INSTRUMENT about the band Fugazi comes an electric concert film featuring the Dutch band, The Ex.

**Preceded by BLESSED ARE THE DREAMS OF MEN**
Jem Cohen, USA, 2006, 10 MINUTES

People daydreaming on a train.

**NYC WEIGHTS AND MEASURES**
Jem Cohen, USA, 2006, 7 MINUTES

Street scenes of Manhattan and Brooklyn during a ticker-tape parade.

**Sat. 6/16 at 11:00 p.m.**

### HIP HOP REVOLUTION
**Weaam Williams**
USA, 2007, 90 MINUTES

The twenty-five year evolution of hip hop in South Africa, from its birth on the Cape Flats to the political uprising in the '80s, giving youth a medium to express themselves and inciting pride when it was needed most.

**Wed. 6/13 at 1:30 p.m.**

### KURT COBAIN ABOUT A SON
**AJ Schnack**
USA, 2006, 97 MINUTES

In rare audio recordings, Kurt Cobain shares in his own words the stories of his childhood, Nirvana's sudden rise to fame, his controversial relationship with Courtney Love, and his struggles with pain and depression.

**Preceded by SONIC YOUTH: "DO YOU BELIEVE IN RAPTURE?"**
Braden King, USA, 2006, 4 MINUTES

This collaboration with Sonic Youth is an elegy for NYC's legendary CBGB club and all the transcendent shows we've all ever been to.

**Fri. 6/15 at 10:15 p.m.**

### NÖMADAK TX
**Raúl De la Fuente**
SPAIN, 2006, 86 MINUTES

The film follows two musicians as they traverse the world with a magical instrument, the Txalaparta. East Coast Premiere.

**Wed. 6/13 at 5:45 p.m.**

### NOTE BY NOTE (THE MAKING OF STEINWAY L1037)
**Ben Niles**
USA, 2006, 80 MINUTES

Steinway pianos are hand built in the Bronx. The builder imparts unique personality to each. This film elegantly shows the creation of Steinway L1037—and the process by which pianists select the Steinway Grand as their voice.

**Sun. 6/17 at 12:30 p.m.**

### SCOTT WALKER 30 CENTURY MAN
**Stephen Kijak**
UK/USA, 2006, 95 MINUTES

With wry lyrics and a reclusive nature, Walker's creative influence reaches further than his name, inspiring the likes of Bowie, Brian Eno, the Smiths, and Radiohead with his unusual tenor vibrato and melancholy songscapes.

**Sat. 6/16 at 10:15 p.m.**

## Beyond Belief: A Selection of Films Addressing Faith, Fanaticism, Spirituality and Ethics

### AUDIENCE OF ONE
**Michael Jacobs**
USA, 2007, 88 MINUTES

San Francisco Pentecostal minister Richard Gazowsky saw his first movie at the age of 40. A year later, God instructed him to write and direct an epic Biblical sci-fi movie. But when the film crew goes on location in Italy, even a divine mission doesn't spare them from Murphy's Law—or the ravings of an egomaniacal director.

**Fri. 6/15 at 10:30 p.m.**

### BRIDGE OVER THE WADI
**Barak Heymann, Tomer Heymann**
ISRAEL, 2006, 54 MINUTES

The Bridge over the Wadi school is an experiment—what happens when Arab and Israeli children attend school together, learning each other's language, culture, and religious traditions? The open acceptance of the children throws the complexity of adult religious and political conflicts into stark relief.

**Sat. 6/16 at 3:15 p.m.**

### BUDDHA'S LOST CHILDREN
**Mark Verkerk**
NETHERLANDS, 2006, 97 MINUTES

A former boxing champion turned monk takes in orphaned children in a poor remote region of Thailand near the Burmese border and transforms their lives.

**Thurs. 6/14 at 11:45 a.m.**

### HARD AS NAILS
**David Holbrooke**
USA, 2007, 78 MINUTES

An unordained evangelical Catholic youth minister travels around the Northeast winning converts and arousing controversy because of the extreme physicality and provocative nature of his preaching style.

**Fri. 6/15 at 9:30 p.m.**

### LIVING GODDESS
**Ishbel Whitaker**
UK, 2007, 87 MINUTES

A lush tale of girl-children who are considered incarnations of the Hindu goddess Kumari. They live peaceful and sheltered lives, worshipped even by their parents, while outside their palace, the people are fighting for democracy against a despotic king, the fruition of an ancient prophecy.

**Sat. 6/16 at 11:00 a.m.**

### MAKING TROUBLE: THREE GENERATIONS OF FUNNY JEWISH WOMEN
**Rachel Talbot**
USA, 2006, 85 MINUTES

Molly Picon, Fanny Brice, Sophie Tucker, Joan Rivers, Gilda Radner and Wendy Wasserstein are saluted for their comedic achievements, intercut with later-day Jewish funny ladies at New York's Katz Deli.

**Sat. 6/16 at 9:15 p.m.**

SPECIAL GUESTS SCHEDULED TO ATTEND

### THE MONASTERY
**Pernille Rose Grønkjaer**
DENMARK, 2006, 84 MINUTES

Mr. Vig donates his Danish castle to an orthodox Russian community led by Sister Amvrosija, who has different ideas about how a monastery should be run.

**Fri. 6/15 at 5:00 p.m.**

### ORTHODOX STANCE
**Jason Hutt**
USA, 2007, 83 MINUTES

An exhilarating study in contrasts. A young Ukrainian Jewish immigrant rises to prominence in New York City's urban boxing gyms, but his fervent commitment to Hasidic beliefs complicates his boxing ambitions.

**Wed. 6/13 at 8:00 p.m.**

### STAND UP: MUSLIM AMERICAN COMICS COME OF AGE
**Glenn Baker, Omar Naim**
USA, 2007, 54 MINUTES

Can you inspire change with laughter? The Muslim-American equality movement might just begin with a joke that changes your mind. Visit the New York Arab American Comedy Festival, including Ahmed Ahmed and other rising comedians.

**Wed. 6/13 at 10:15 p.m.**

SPECIAL GUESTS SCHEDULED TO ATTEND

THE FIRST SATURDAY IN MAY

Exhibit B
Page 10

WAR TORN

## Short Films

### SHORTS 1: SIGHT & SOUND

TOTAL RUNNING TIME: 74 MIN.

**THE FIGHTING CHOLITAS**
**Mariam Jobrani**
USA/BOLIVIA, 2006, 21 MINUTES

Bolivian indigenous peasants, la cholitas-wear traditional layered skirts when slamming each other in the ring. The luchas' strength inside the ring and out is remarkable.

**THE GUARANTEE**
**Jesse Epstein**
USA, 2007, 11 MINUTES

A male ballet student is confronted about his large nose; he weighs his options in hopes of more lead roles with a smaller schnoz. Told in witty hand-drawn animation.

**HATTENHORST**
**Ove Sander**
GERMANY, 2006, 5 MINUTES

Hans Hattenhorst moved to the German island of Juist in the 1940s and has worked ever since as a projectionist in the small cinema—but has long lost his passion for movies.

**MOTODROM**
**Joerg Wagner**
GERMANY, 2006, 9 MINUTES

Vrrroom! On the edge of your seat, watch gravity-defying motorcycle stunts race by in sterling black and white.

**MY EYES**
**Erlend E. Mo**
DENMARK, 2006, 19 MINUTES

Music is integral in Katja's life, evoking experiences and emotion. Young Catherine is also grappling with enhanced senses in her blind world, and with her mother, discovers the joy in sound and touch.

**RENDEZ-VOUS**
**Marcin Krawczyk**
POLAND, 2006, 9 MINUTES

Get refreshing perspective on the ubiquitous dating rituals that many of us take for granted. Over candelight dinner, a young couple with Down's Syndrome discuss their perception of the "dating" rules, and their desire to adapt to them.

**Wed. 6/13 at 12:00 p.m.**
**Sat. 6/16 at 10:30 a.m.**

### SHORTS 2: EMBATTLED

TOTAL RUNNING TIME: 70 MIN.

**BULLET PROOF VEST**
**May Lin Au Yong**
USA, 2006, 6 MINUTES

In protest of Richmond, California's extreme youth gun violence, twins Mustapha and Jyeshria live in a playground "tent city" with their mother. They candidly tell why they don't play outside.

**IRAQI KURDISTAN**
**Ed Kashi**
USA, 2006, 12 MINUTES

An alternative perspective on a changing culture, one different from the destruction and discord that dominates so much media coverage of the region.

**LOT 63, GRAVE C**
**Sam Green**
USA, 2006, 10 MINUTES

Altamont Free Concert, 1969. Meredith Hunter is killed at this infamous event; his death becomes an icon for the end of the Summer of Love. Now, he lies forgotten, buried in an unmarked and unvisited grave.

**SARI'S MOTHER**
**James Longley**
USA, 2006, 21 MINUTES

Set against the backdrop of the Iraq War, a desperate mother attempts to find medical care for her 10-year-old son, Sari, who contracted AIDS during a blood transfusion.

**WAR TORN: STORIES OF SEPARATION**
**David Modell**
UK, 2006, 21 MINUTES

Four women tell of their men at war. Their stories show the emotional resonance of another's story and the often devastating, unexpected outcomes of war.

**Thurs. 6/14 at 12:00 p.m.**
**Fri. 6/15 at 4:15 p.m.**

### SHORTS 3: YOU & ME

TOTAL RUNNING TIME: 71 MIN.

**FREEHELD**
**Cynthia Wade**
USA, 2007, 38 MINUTES

At the center of the equal rights debate, Lt. Laurel Hester is dying of lung cancer and fighting to pass her police pension to her life partner, Stacie Andree. The city explodes with controversy; Laurel only wants to provide for her love—before it's too late.

**I JUST WANTED TO BE SOMEBODY**
**Jay Rosenblatt**
USA, 2006, 10 MINUTES

Orange juice ad queen Anita Bryant crusaded against gay civil rights in the 70s, but was important both to the creation of the religious right and to the gay rights movement.

**MONSIEUR BORGES AND I**
**Jasmin Gordon**
USA, 2006, 23 MINUTES

A portrait of an eccentric French professor who dedicated his life to his friend and hero, the literary giant Jorge Luis Borges.

**Fri. 6/15 at 12:00 p.m.**
**Sun. 6/17 at 7:00 p.m.**

### SHORTS 4: BEYOND BELIEF

TOTAL RUNNING TIME: 73 MIN.

**THE DAYS AND THE HOURS**
**John Haptas, Kristine Samuelson**
USA, 2006, 9 MINUTES

A thin paycheck separates many Americans from homelessness. Taking daytime refuge in church, they reflect on the lives they had before they lost their shelter.

**GOD PROVIDES**
**Brian Cassidy, Melanie Shatzky**
USA/CANADA, 2007, 9 MINUTES

In Katrina's aftermath, an exploration of faith and loss in Louisiana.

**MY NAME IS AHMED AHMED**
**Matthew Testa**
USA, 2006, 9 MINUTES

Ahmed, a Muslim American comedian, jokes about his name and about being brown. If his routine changes ideas about Muslims, it's a rare perk in the world of stand-up.

**ORISHAS ARE OUR SAINTS**
**John Kane**
USA, 2006, 5 MINUTES

A contemplative look at the modern practices of the Afro-Cuban religion Santería. The stunning black and white film reverently shows rare images of the seaside rituals and devotions.

**PARADISE DRIFT**
**Martin Hansen**
NETHERLANDS, 2006, 14 MINUTES

Hikers trek to a ridge for a shared mystic event. Viewers are left to create their own interpretation of this mysterious and calm night-time endeavor.

**A SON'S SACRIFICE**
**Yoni Brook**
USA, 2006, 27 MINUTES

Imran quit being a Manhattan ad man to run the family Halal slaughterhouse in Queens. His faith and patience are tested during Eid al-Adha, the Feast of Sacrifice.

**Thurs. 6/14 at 1:30 p.m.**
**Sun. 6/17 at 11:45 a.m.**

### SHORTS 5: LONG DISTANCE

TOTAL RUNNING TIME: 71 MIN.

**6 CONCEPTIONS OF FREEDOM**
**Thomas A. Ostbye**
NORWAY, 2006, 19 MINUTES

A meditative study of Oslo's Alexander Kiellands Plass. Through the camera lens, loneliness and powerlessness bring into focus the limitations of the idea of freedom.

**CALCUTTA CALLING**
**Andre Hörmann**
GERMANY, 2006, 17 MINUTES

Hello? This salesman is phoning from India, selling fire extinguishers to the English-speaking world. Vikeeh takes us into the call center-one of the most lucrative working class jobs in South Asia.

**MY 9/11**
**Tjebbo Penning**
USA/NETHERLANDS, 2006, 12 MINUTES

Finding it too difficult to accept, Penning's film attempts to show everything but the towers' collapse, but returns to the horrifically mesmerizing image.

**TALK TO ME**
**Mark Craig**
UK, 2006, 23 MINUTES

Sex, drugs, music, birth, death, nightlife and lazy days. A life told through 21 years of voicemail.

**Wed. 6/13 at 2:00 p.m.**
**Sun. 6/17 at 2:15 p.m.**

# SILVERDOCS 2007 INTERNATIONAL DOCUMENTARY CONFERENCE

An unprecedented gathering of filmmakers, documentary leaders, private and public media, distributors, commissioning editors, new media innovators, and the philanthropic community.

Conference Key Note: Ted Leonsis

Philanthropist, media leader (Vice Chairman, America Online and President, AOL Business) and executive producer of NANKING, Leonsis links the lessons of the Internet to the future of distribution.

PAST CONFERENCE HIGHLIGHTS

2007 Highlights:

- Four days of inspiring discussions, strategic market intelligence and trend-setting professional development in over 60 panels and workshops
- One-on-one access to key industry decision makers
- Access to the full SILVERDOCS Festival Program
- SILVER SESSIONS: Conference registrants may sign up on a first-come, first-served basis for small group meetings with international media executives

## 2007 FEATURED PANEL STRANDS AND WORKSHOPS

**"Filmanthropy"— A New Wave of Active Media Alliances**

Explore links between filmmakers, non-profits, NGO's and philanthropists with principals from Participant Productions, Shine Global, The Sundance Institute Documentary Fund, Active Voice, Ford Foundation, Amnesty International, WITNESS, Arts Engine, Symetra and more.

**Future of Real 2.0— Rights, Readiness & Revenues**

Web 2.0 and the expanding interactive on-line world: What cutting edge tools does every filmmaker need and where is the money? Join executives from AOL True Stories, Amazon, Customflix, Jaman, NETFLIX, Open Media Network and Revver.

**US Public Television— A Hands-on Guide**

Join executives from PBS, CPB, ITVS, LinkTV, APT, NETA, National Minority Consortia, and producing stations, along with commissioning editors from P.O.V., WideAngle, NOVA, AMERICAN EXPERIENCE, and INDEPENDENT LENS as they explain the ins and outs of public television.

**Inside Discovery**

Get the inside scoop on commissioning and programming priorities from top development and production executives at Discovery Channel, TLC, Animal Planet, Discovery Studios, Discovery HD Theater and Discovery PlanetGreen.

**Plus:**

- Project Greencode: Rising to the Challenge of Eco-Friendly Production
- Broadcast Slots on US and International Television
- Creating a Fundraising Blueprint

Exhibit B
Page 12

COMMUNITY SPONSORS

# SILVERDOCS SALUTES OUR COMMUNITY SUPPORTERS!

**Please visit our sponsors in Silver Spring and DC. Many Sponsors offer SILVERDOCS pass holder specials during the Festival!**

**The Eddie Becker Band (rock, soul, R&B)**
**Thursday, June 14, 7:00 p.m.**
In concert in the Silver Plaza (by the fountain)

SPONSORED BY
CELEBRATE SILVER SPRING!

**Diamond Alley**
**Saturday, June 16, 6:00 p.m.**
In concert in the Silver Plaza (by the fountain)

SPONSORED BY
THE PETERSON COMPANIES

gsscc.com

AUSTIN GRILL
919 ELLSWORTH AVE.
SILVER SPRING
austingrill.com/austingrillee

BORDERS.
8518 FENTON STREET
SILVER SPRING
bordersstores.com

921-J ELLSWORTH AVE.
SILVER SPRING
latinconcepts.com/ceviche

8661 COLESVILLE ROAD
SILVER SPRING

GRANDCENTRAL
2447 18TH ST. NW,
WASHINGTON, DC

8081 GEORGIA AVENUE
SILVER SPRING
jackiesrestaurant.com

911 ELLSWORTH DRIVE
SILVER SPRING
mcgintyspublichouse.com

Bring your ticket to any of our 5 locations during the Festival (June 12-17) & get a FREE box of Newman's Organic popcorn.
myorganicmarket.com

8541 GEORGIA AVE.
SILVER SPRING
panera.com

Quarry House Tavern
beer. burgers. basement.
8401 GEORGIA AVE.
SILVER SPRING

915 ELLSWORTH DR.
SILVER SPRING
starbucks.com

833 WAYNE AVE
SILVER SPRING
wholefoodsmarket.com/stores/silverspring/

## valuable coupon to benefit SILVERDOCS

# 10% off

## YOUR TOTAL PURCHASE

valid June 12 – 17, 2007

**10% of the net sales raised from this coupon will be donated to SILVERDOCS**

10% of the final purchase amount, excluding Gift cards, will be donated to SILVERDOCS: AFI/Discovery Channel Documentary Festival. Discount combines with in-store promotions and offers. Discount does not combine with Borders Rewards Personal Shopping Day. Excludes previous and online purchases, gift cards, periodicals, comics, non-stock special orders, all electronics including the Sony Reader® and the Zune™, Seattle's Best Coffee® products, and shipping. May not be combined with other coupons or corporate, classroom, or other group discounts. One coupon per customer, per day. Void where prohibited by law. Any other use constitutes fraud. Cash value .01¢. Not redeemable for cash. Valid only in the Silver Spring Borders store, 6/12-6/17/2007. Borders cashiers: Ring items, select S3, select S6, scan or enter coupon #, select S2, enter 10%, Total.

BORDERS.

Exhibit B
Page 13

## HIGHLIGHTS & EVENTS

Look who's coming to SILVERDOCS

ACE: Animal Content in Entertainment
Active Voice
AFI Digital Content Lab
Amazon/CustomFlix
America Online
AMERICAN EXPERIENCE
American Public Television
Animal Planet
AOL True Stories
ARTE-France
Arts Engine/Media That Matters
BBC
Center for Asian American Media
Center for Environmental Filmmaking
Center for Social Media
CPB
Discovery
Documentary Educational Resources
First Run Features/Icarus Films
Ford Foundation
HBO
International Documentary Association
ITVS
Jaman
Joost
Kaiser Family Foundation
Koch Lorber Films
Lantern Lane Entertainment
Latino Public Broadcasting
LinkTV
National Black Programming Consortium
National Endowment for the Arts
National Endowment for the Humanities
National Geographic
National Science Foundation
Native American Public Telecommunications
Necessary Illusions
NETA
Netflix-Red Envelope
New Day Films
NOVA
NOW with David Brancaccio
Open Media Network
Open Source Cinema
Pacific Islanders in Communications
Participant Productions
PBS
POV
PRX
Pump Audio
Re:New Media
Revver
Shine Global Foundation
Submarine Entertainment
Sundance Channel
Sundance Institute Documentary Fund
The Documentary Channel, Canada
The GreenCode Project
THINK Film Company
Thirteen-WNET
Vision TV, Canada
WETA
WGBH
WHUT-Howard University
WITNESS
Women Make Movies
Worldwide Biggles
YLE

SILVERDOCS
cinemaLounge

### Cinema Lounge Passholders only!

- The CINEMA LOUNGE is the social hub of the Festival
- Free wi-fi access
- Film screening library
- Happy-hours and receptions
- Panels and special events

IRON LADIES OF LIBERIA

TAXI TO THE DARKSIDE

PLEASE VOTE FOR ME

### Why Democracy?

**Friday, June 15, 2007**
**Private Reception: 6:00 – 7:00 p.m.**
**Program: 7:00 – 9:00 p.m.**
WILLIAM G. McGOWAN THEATER AT THE NATIONAL ARCHIVES
DOWNTOWN WASHINGTON, DC

Award-winning filmmakers from around the world have created a series of films intended to initiate a global conversation about democracy. This program will include selected highlights from several of these films including PLEASE VOTE FOR ME from China, IRON LADIES OF LIBERIA from Liberia, DINNER WITH THE PRESIDENT from Pakistan, and TAXI TO THE DARKSIDE from the US.

The program will feature several of the filmmakers along with series executive producers Don Edkins from South Africa, Nick Fraser of the BBC, and Marvin Pinkert of the Center for the National Archives Experience.

## SILVERDOCS.com v2

**Log on to the all-new SILVERDOCS.com and stay up to date!**

- > Watch trailers from the world's hottest new docs.
- > View daily event highlights during the Festival
- > Explore Conference resource rooms to enhance your professional development
- > Check out the NEWS AND LINKS section—meet our partners, read what people are saying about SILVERDOCS
- > Listen to podcasts from the best of SILVERDOCS 2006

Other ways to stay connected:

Subscribe to the SILVERDOCS newsletter to get the latest Festival news and announcements

Become SILVERDOCS friend at Myspace.com/silverdocs

**Exhibit B**
**Page 14**

# TICKETS ON SALE MAY 23

Web: SILVERDOCS.com
Phone: 1.877.DOCS.TIX Noon – 8:00 p.m., daily through June 11
AFI Silver Box Office Hours: 11:00 a.m. – 9:00 p.m., May 18–June 17

## INDIVIDUAL TICKET PRICES

| | | | |
|---|---|---|---|
| General Admission: | $10.00 | Opening Night Gala | $50.00 |
| Discount price* | $8.00 | Guggenheim Symposium | $25.00 |

*Day-of-Show Tickets are CASH only.* No Refunds, Exchanges or AFI Passes Accepted.
* (for AFI members, student, child, senior and military with valid ID.)

## Passholder-only post-screening events:

TAXI TO THE DARKSIDE

### Independent Documentary Perspectives on War

**Thursday, June 14, 2007**
**5:30 – 6:30 p.m.**

Festival filmmakers discuss how nonfiction storytelling engages the issues of wars, past and present.

BIG RIG

### BIG RIG After Party

*Musical Performance by Buck 65*

**Thursday, June 14, 2007**
**10:00 p.m.**

The screening will be followed by a live concert from the film's composer Buck 65 at the Silver Spring Moose Lodge.

AUDIENCE OF ONE

### Beyond Belief Panel Discussion: Inspired Filmmaking on Inspired Subjects

**Friday, June 15, 2007**
**5:00 – 6:00 p.m.**

Special guests, including filmmakers and subjects from the Beyond Belief Program, discuss religion and film. (See page 10 for film listings)

## Enjoy passholder-only screenings of selected films.

Can't make a scheduled screening? Use your Festival pass to get access to special, passholder-only repeat screenings of many films.

## BUY A PASS

Avoid ticket lines, relax at the Cinema Lounge, meet filmmakers and maximize your Festival experience!

Discounts available on all passes for AFI, IDA, IFP, ITVA & WifV members

**Platinum All-access Package: $1000**
Total access for two to galas, screenings and Conference

- TICKETLESS ENTRY to regular screenings
- Admission to Opening Night and Guggenheim Symposium
- Invitation for two to one VIP reception
- Access to all sponsored Conference receptions
- Four regular screening ticket vouchers to use as gifts
- Two $50 AFI Friend memberships

**Silver Film Buff Pass: $225**
The most popular pass for film lovers. Does not include access to International Documentary Conference.

- Admission for one to Opening Night OR another special program, excluding Guggenheim Symposium
- Ticketless entry to all weekday, daytime Screenings (4 p.m. or earlier, Wed.–Fri.)
- Ten regular screening vouchers
- Access to the Cinema Lounge, excluding private events

PASSHOLDERS ARE INVITED TO ATTEND THE SILVERDOCS AWARDS CEREMONY AND RECEPTION AND THE SILVERDOCS AUDIENCE AWARD CEREMONY AND BRUNCH.

**Sterling All-access Pass:** **$600**
Enjoy VIP Festival Access to Galas, Screenings, and Conference

**Industry Pass:** **$400**
Total Conference Access for Film Professionals

**Conference Day Pass:** **$150**
Access to Conference Programs plus two Regular Screenings

**Student Pass:** **$125**
Selected access to Conference programs, screenings and the Cinema Lounge for registered students with ID

**Questions? Contact us at registration@SILVERDOCS.com**

**Visit SILVERDOCS.com or call 1.877.DOCS.TIX for more information on other Passes and for individual ticket sales and policies.**

Exhibit B
Page 15

SILVERDOCS

# SILVERDOCS goes green

**Green Docs**

ARCTIC TALE
GARBAGE WARRIOR
HOW TO COOK YOUR LIFE
IN THE SHADOW OF THE MOON
OFF THE GRID: LIFE ON THE MESA

**Panel**

PROJECT GREENCODE: RISING TO THE CHALLENGE OF ECO-FRIENDLY PRODUCTION

> "The more clearly we can focus our attention on the wonders and realities of the universe about us, the less taste we shall have for destruction."
> –RACHEL CARSON, Environmentalist & Silver Spring Native

The first carbon-neutral documentary festival in North America through a partnership with Clean Currents, LLC, a DC-area sustainably-operated clean energy business that is donating carbon offsets.

Earth-friendly Festival initiatives will include recycling drives, environmentally friendly publications, eco-friendly merchandise, party supplies etc.

SILVERDOCS ENCOURAGES GUESTS TO TAKE METROBUS OR METRORAIL TO THE FESTIVAL.

AFI Silver Theatre and Cultural Center
8633 Colesville Rd. Silver Spring, MD 20910
SILVERDOCS.com 1.877.DOCS.TIX

Comcast SILVERDOCS.com

Discovery

# EXHIBIT  C



**Congressional Human Rights Caucus (CHRC)**

**Briefing and Screening:**

# Screening of Documentary Film on Deplorable Conditions in the Dominican Republic's Sugar Plantations

Documentary:
***The Price of Sugar*** (2007)

**Wednesday, November 14, 2007**

**2:30pm – 4:00pm**

**2200 Rayburn**

## Rev. Christopher F. Hartley

**Introduction.**

Congressman Lantos
Congressman McGovern

My heartfelt thanks to both of you and to all the members of the **Congressional Human Rights Caucus (CHRC)** who have worked so hard to put together this event.

It is a real honor for me to be with you this afternoon.

1.- I come before you, not in my own name, but in the name of the thousands and thousands of workers, men women and children, who every day struggle to survive in the sugar cane plantations of the Dominican Republic.

I am here to lend my voice to the cry of this voiceless humanity whose tragic fate I have had the privilege to witness and accompany over the past ten years of my priestly ministry. I will never be able to thank the Good Lord for the grace of this experience.

2. - Let me make it perfectly clear from the very start that I am not a member of any organization, I am not a human rights champion; I do not work for any international organization to defend or denounce anyone; I have no links or ties to any civil or political institution; I have no hidden agendas. I am only a member of the Catholic Church.

Furthermore, I am not a financial expert; I have no qualifications in the area of Human Rights; I have no degrees in International Relations; I know very little about politics. I am no expert on the Dominican-Haitian relations.

All I am is a Catholic Priest

But by virtue of the mission entrusted to me by Jesus Christ and the Church I can assure you that my only real credentials to be with you today, is the unconditional love I have for the people I served for almost ten years in the sugar cane fields of the Eastern part of the Dominican Republic.

3. - For this love, I have paid and continue to pay a very heavy price. A love that has at times been the cause of much fear in my heart; a love for which I have been slandered and humiliated, persecuted and badmouthed; a love for which on several occasions my life has been threatened; a love that at times has been for me, for my family and my parishioners a real crucifixion. However, at the same time, a love, which has always reminded me in my darkest hour, that as the Lord say in the Gospel: *"No one has greater love than the one whom lays down his life for his friends"*.

4. - What you are about to see in the documentary "The Price of Sugar", is only but a glimpse of the tragedy; the human degradation in which so many thousands of human beings waste their lives in this very evil industry of which they have become its prisoners.

I know of about twelve documentaries produced on this same topic in recent years. I assure you that none of them could ever capture – even remotely - the human suffering my eyes witnessed and my hands touched. It will always be beyond my understanding how the Dominican government, and three of the wealthiest families of the Dominican Republic: The Fanjul family; the Vicini family and the Campollo family; could permit their workers and their dependants to wallow in such injustice, in such filth, in such misery, in such an absurd fate; in such human degradation.

5. - After so much hard work there have been some positive changes in the bateyes of the sugar cane fields. For those changes, we rejoice.

Nevertheless, much remains to be done: But because the rule of law is so fragile in the Dominican Republic and the institutions that should guarantee everyone's human and labor rights so ineffective. Because the sugar barons are so immensely powerful. And most of all, because practically all of the sugar harvested in the Dominican Republic is imported and refined by the United States of America for your domestic and industrial consumption, I very strongly believe that the United States is just as responsible as the Dominican Republic for the present situation of the sugar industry in that Caribbean island.

6. - Isn't it almost humorous to think that we gather this afternoon, on behalf of the workers of the sugar cane plantations. Which have been described in the Human Rights Report of 2006, published in March of this year by the State Department of

the United Sates as "modern day slavery", in the very same building were your own legislators pass law after law, that shields the sugar industry of any real accountability and therefore, any real possibility of lasting change?

7. - I recently wrote to a very prominent US official in the United States Embassy to the Dominican Republic some reflections on the present situation in the Dominican sugar cane plantations. I pointed out how in most cases, the changes were a fiction. Not because these changes were not real, but because they happened for the wrong reasons. The sugar industry does not respond to the rule of law, but to the pressure of the media, and the sugar barons well know that the media will not keep it's inquisitive aye eternally on their plantations.

If the rule of law is not applied to the sugar industry in the Dominican Republic, but most of all in the United States, eventually things will return to the way they always were.

I quote from what I wrote to this US diplomat in the Dominican Republic:

"[...] It is true that many changes have taken place, I am the first to have witnessed them and the first to rejoice for them. The problem with these changes is that they took place for the wrong reasons.

The changes are a fiction. They are a fiction because they are not an expression of the rule of law entering the sugar industry. The changes are a circumstantial response to the unbearable pressure of a certain period. I don't rejoice in the fact that changes took place because of the pressure we had subjected these families to. [...] That was a tragedy because it was a fiction of the rule of law. The Dominican government: the DR Labor Department, the Ministry Interior and Police were responding to the internal and international pressure we were able to generate. These governmental institutions were not applying the rule of law (they could care less), they were responding to the pressure of the moment. This explains why the sugar industry and the Dominican government is so eager to shake of this pressure.

9.- Two of the main changes frequently trumpeted: trafficking in persons and child labor, are not as real as the government and the industry proclaim.

a. Child labor. Simply put: the kids continue to sow the fields. It is just more hidden. Elegant signs are posted to indicate the Vicini do not permit the practice, but the practice continues. There is practically no supervision from the Labor Department and when it is discovered, the kids are scolded!! But no sanctions are imposed on the company.
b. Trafficking in persons continues unchecked across the border. Everybody knows. Maybe not in the scale of the past but this is just a temporary phenomenon. Once the international outcry fades and the splash of the latest documentary fades away, it will return. Why? Again, it didn't change because of the rule of law but because of the international pressure of the media. This pressure cannot continue indefinitely. It will pass, it won't be news worthy, other issues will come up. [...]"

End of quote.

8.- It has been my privilege to work side by side with wonderful human beings who have done their very best to bring about the some changes to this very evil industry. It would be impossible for me to name them all.

However, I truly believe the real heroes of this story are the workers themselves. They had the courage to stand up to this injustice.

Maybe a simple anecdote can illustrate this: right before my departure, an ealderly worker of the Vicini plantations – whose name and the name of the batey I withhold for his own security - said to me: "Father, our lives are still filled with misery, but you know? Now everything is different, because before we were so afraid that every time the bosses yelled at us, we would always put our heads down, but now, when they come to us, we always look up."

To me, these are the real heroes.

9.- There are, on the other hand, new challenges ahead and I quote from the aforementioned text:

"[...] On another front: We must be specially attentive to the new developments regarding the harvesting of sugar cane (note I do not say the "sugar industry"), it has to do with the much talked about ETHANOL. Remember it is a new venture. A joint venture, which involves the Vicini, Fanjul, some Brazilian corporations and the Dominican government. Among my colleges we are calling it "asociación de malhechores".

This will require thousands of workers, thousands of Haitian migrant workers, plus women and children. Kid yourself not, they are not going to invest on hundreds of harvesting machines and other machinery in the first years. They must first be sure the project is going to be a success. The proposed site as you know, is the ingenio, bateyes and cane fields of the Ingenio Boca Chica and the Ingenio Quisqueya. I know every square inch of those plantations like the palm of my hand, they are both within the boundaries of the Parish of San José de Los Llanos, It is going to take many years until it can be mechanized for very complicated technical reasons. The infrastructure is simply not there. Thousands of men are going to be required. Mark my words...

[...]

<u>In the end, I am left with a question myself</u>. That is: <u>How hard and how far is the US government ready to push</u> on the issue of Human and Labor Rights in the sugar cane plantations (Embassies, diplomats can only implement in the end the policies and the directives of the governments they represent, is it not so?)? What mechanisms of "check and balance" are you ready to implement in order to keep the Dominican government and sugar industry honest? [...].

End of quote.

10. · I wish to offer my heartfelt gratitude To Bill Haney and Eric Grunebaum for their extraordinary effort at producing this documentary, which I pray to God will touch the minds and hearts of all of you and many others. Without their courage and professionalism we would not be meeting today on behalf of the many thousands of sugar cane workers who have placed so much trust in us. With them, I wish to thank and honor all the professionals of the media who had the determination of bringing this evil to light. Without you all, I would still be shouting in the wilderness of a sugar cane field but no one would hear my voice.

To conclude, my final remarks are for Congressman Lantos and Congressman McGovern. Many of us, the little people on the street, are doing our very best to bring about the necessary changes, even though on the world scene it might not amount to very much.

You can do much more. Maybe your efforts will demand that you pay a heavy price too. I say to you what I said repeatedly to the poor Haitian workers: don't be afraid! I assure you that though many of your efforts might not be rewarded at the ballot poll; there are efforts on behalf of God's poorest children that will only be rewarded in heaven.

Gentlemen, it is in your hands now to make sure all this hard work not be put to waste. It is now in your hands to bring the dawn of a new day to the terrible darkness that still hovers over the sugar cane fields of the Dominica Republic.

Thank you very much and may God bless you all.

# EXHIBIT  D

**Uncommon Productions LLC**
282 Moody Street, Suite 309
Waltham, MA 02453

As of April 21, 2005

**Father Christopher Hartley**

Los Llanos

Dear Father Christopher:

This letter confirms our understanding with respect to a documentary motion picture currently entitled "Act of Hope" (the "Documentary") concerning your work with the sugar cane cutting communities in the Dominican Republic, as follows:

1. In appreciation for your cooperation and the rights you are granting to us, we agree to pay a charity designated by you 50% of any profit we make on the Documentary after recovering our costs.

2. You will consult with us, provide us with information, allow yourself to be interviewed and otherwise reasonably cooperate with us in production of the Documentary. We agree that we will use only biographical information concerning you provided by you or otherwise approved by you.

3. You agree that we may use your name and likeness, biographical information concerning you and any interviews or other recordings of you in the Documentary and in the distribution, advertising, publicity and promotion of the Documentary in any media, now or hereafter known, throughout the universe in perpetuity. We will own the Documentary and any other works prepared in connection with it, and you agree not to assert any copyright or other rights of ownership therein. We agree, however, that we will not license the Documentary for exhibition on any cable television service that primarily exhibits programming that is rated TV-MA ("Mature Audience") under the Federal Communications Commission's V-chip ratings system (such as the Playboy Channel).

4. As the producer, you understand that we will have editorial control of the Documentary and you agree that we may edit any depictions of you, any material provided by you and any of your statements or comments and may juxtapose any of the foregoing, or any simulation and/or impersonation of them, with any other material selected by us. You waive and agree not to assert any claims based upon such and editing and use of such material, including, but not limited to, claims or liabilities for libel, slander, invasion of the right of privacy, or other infringement or violation of your personal or property rights of any sort whatsoever. We agree, however, that this consent is given with the understanding that Bill Haney will be associated with the Documentary throughout photography and editing (other than any editing after the completion of the Documentary for local censorship, broadcast time, etc.).

5. You confirm to us that you have the right to grant every right granted herein without the consent of any other person and will indemnify us against any contrary claim.

6. We may assign or license any of the rights granted by you to any third party after the Documentary has been finished (examples of third parties are distributors, broadcasters, etc.). We will not authorize any such third party, however, to edit the Documentary in any material way, except for timing and to comply with local censorship requirements and broadcast standards. We will not license any recording of you for any production other than the Documentary and the advertising, publicity and promotion of the Documentary without your consent.

Please confirm your agreement to the above by signing in the space below.

**Uncommon Productions LLC**

By ______________________
Bill Haney, Manager

ACCEPTED AND AGREED:

______________________
**Father Christopher Hartley**

# EXHIBIT  E



**H**
Regents of University of California v. Kohne
S.D.Cal.,1996.

United States District Court,S.D. California.
The REGENTS OF the UNIVERSITY OF CALIFORNIA, Plaintiff,
v.
Dr. David E. KOHNE, an individual, and Gen-Probe, Inc., Defendants.
**No. 93-1539 J (CM).**

April 24, 1996.

Motion was filed to quash subpoena on ground nonparty neither resided, was employed, nor regularly transacted business in person within 100 miles of courthouse. Motion was granted by McKee, United States Magistrate Judge, and defendant sought to overturn ruling. The District Court, Jones, J., held that: (1) determining whether party does not regularly transact business within 100 miles of courthouse does not require jurisdictional-type analysis; (2) burden of proof was on movant; and (3) movant presented insufficient evidence.

Order vacated.

West Headnotes

**[1] Witnesses 410 ⚷6**

410 Witnesses
410I In General
410k6 k. Place Where Attendance May Be Required; Obtaining Presence of Witness from Without Jurisdiction. Most Cited Cases
Analysis applicable to jurisdictional determinations, whether of specific or general jurisdiction, is inappropriate for purposes of determining whether nonparty does not regularly transact business in person within 100 miles of place nonparty is commanded to appear, so that nonparty may move to have court quash or modify subpoena; "regularly transacts business in person" means just what it says. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

**[2] Witnesses 410 ⚷4**

410 Witnesses
410I In General
410k3 Persons Who May Be Required to Appear and Testify
410k4 k. In General. Most Cited Cases
In considering when nonparty witness may be commanded by subpoena to appear, court does not consider forum state's power or notice to witness, but only burden to the witness of being required to physically appear. Fed.Rules Civ.Proc.Rules 45, 45(c), (c)(3)(A)(ii), 28 U.S.C.A.

**[3] Witnesses 410 ⚷6**

410 Witnesses
410I In General
410k6 k. Place Where Attendance May Be Required; Obtaining Presence of Witness from Without Jurisdiction. Most Cited Cases
Within rule providing that nonparty who neither resides, is employed, nor regularly transacts business within 100 miles of place nonparty is commanded to appear may move to have court quash or modify subpoena, "regularly" does not mean ten times in seven years. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

**[4] Witnesses 410 ⚷9**

410 Witnesses
410I In General
410k7 Subpoena
410k9 k. Application and Proceedings Thereon. Most Cited Cases
Nonparty moving to quash subpoena bears burden of proof, but even conclusory affidavit by nonparty providing factual information from which to make determination that he does not transact business within 100 miles of courthouse would suffice to shift burden of production to opposing party to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prove the falsity of his claim. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

**[5] Evidence 157 ⚿10(2)**

157 Evidence
157I Judicial Notice
157k10 Geographical Facts
157k10(2) k. Location of Cities, Towns, and Villages. Most Cited Cases

**Witnesses 410 ⚿9**

410 Witnesses
410I In General
410k7 Subpoena
410k9 k. Application and Proceedings Thereon. Most Cited Cases

When nonparty moving to quash subpoena submitted evidence that he was employed in certain city, magistrate would have been permitted to take judicial notice that city was over 100 miles from courthouse and would have been permitted to infer that nonparty resided over 100 miles from courthouse, but would not have been permitted to infer that nonparty did not regularly transact business in person within 100 miles of courthouse, absent affidavit stating number of times, to his best recollection, that he had conducted business within 100 miles of courthouse and time frame against which to compare that number. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

***463** Robert Berliner,Robbins, Berliner and Carson, San Diego, CA, for Regents of the University of California.
F.T. Alexandra Mahaney, Douglas E. Olson, Richard J. Warburg, Robert W. Dickerson, Lyon and Lyon, La Jolla, CA, for David ***464** E. Kohne, Ph.D., an individual defendant and Gen-Probe, Inc.

**ORDER VACATING MAGISTRATE'S DISCOVERY ORDER AND REQUIRING FURTHER BRIEFING**

JONES, District Judge.

**I. INTRODUCTION**

Defendants Gen-Probe, Inc. and David Kohne request this Court to overturn the ruling of Magistrate McKee granting third-party Norval Galloway's Motion to Quash Subpoena, and imposing sanctions. For the reasons stated below, the Court vacates the Magistrate's Order and orders the parties to submit further briefing to this Court in order to permit a final decision on this motion.

**II. STANDARD OF REVIEW**

On review of a nondispositive pretrial matter, the Court may only "modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a).

**III. DISCUSSION**

Federal Rule of Civil Procedure 45(c)(3)(A)(ii) provides that a non-party who neither "resides, is employed, or regularly transacts business in person" within 100 miles of the place they are commanded to appear may move to have the court "quash or modify" the subpoena.

[1] Defendants argue that the Magistrate should have interpreted the "regularly transacts business in person" language of Rule 45 as calling for the same analysis that courts engage in to determine whether a party should be subject to the jurisdiction of a state for purposes of specific jurisdiction. *See Data Disc, Inc. v. Systems Technology Assocs.,* 557 F.2d 1280, 1297 (9th Cir.1977). Plaintiffs argue that the "regularly transacts business in person" language should be interpreted as calling for the analysis courts engage in to determine whether a party may be subjected to the general jurisdiction of a state. *See Scott v. Breeland,* 792 F.2d 925, 928 (9th Cir.1986) (describing general jurisdiction). The Court disagrees with both sides, and holds that "regularly transacts business in person" means just what it says.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[2] Jurisdictional analysis is inappropriate for analyzing Rule 45 because it responds to an entirely different set of concerns. In considering specific or general jurisdiction, courts ask under what circumstances would due process permit a state to enforce its laws over a party. This analysis is driven by concerns both as the reasonable limits of the power of the state, and as to the requirement that a party be at least fairly on notice that its conduct would subject it to that state's laws. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-78, 105 S.Ct. 2174, 2181-85, 85 L.Ed.2d 528 (1984). In considering when a non-party witness may be commanded by subpoena to appear, however, the court does not consider the forum state's power or the notice to the witness, but only the burden to the witness of being required to physically appear. This is the only concern of Rule 45(c). *See*Rule 45, 1991 advisory committee note ("The purposes of this revision are (1) to clarify the protections afforded persons who are required to assist the court by giving information and evidence ...").

The Federal Rules provide other options to the litigant seeking to introduce the testimony of a distant non-party. Reading these rules in harmony requires the conclusion that the language of Rule 45(c)(3)(A) should be read literally. Under the rules of evidence, prior deposition testimony may be allowed over a hearsay objection if the witness was "unavailable." Fed.R.Evid. 804(b)(1). "Unavailability" may be found when the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... by process or other reasonable means." Fed.R.Evid. 804(a)(5). Federal Rule of Civil Procedure 32(a)(3) elaborates that this includes the situation in which a "the witness is at a greater distance than 100 miles from the place of trial." Consistent with these rules, Rule 45(c)(3)(A)(ii) should be interpreted to mean simply that one is at a greater distance than 100 miles when one neither "resides, is employed, or regularly conducts business in person" there.

***465** [3] The Magistrate's interpretation of the rule is the correct one. The Magistrate also correctly applied the rule: "regularly" does not mean ten times in seven years.

[4] However, defendants also argue that the Magistrate incorrectly put the burden of proof upon them. The Court agrees with the defendants that the moving party bears the burden of proof. *See, e.g., Goodman v. United States,* 369 F.2d 166, 169 (9th Cir.1966). Neither the oral nor the written ruling of the Magistrate provide a clear basis for determining whether it correctly placed the burden of proof upon the moving party.

[5] Further, the Court's review of the record indicates that the moving party presented insufficient evidence for the Magistrate to find the Rule inapplicable. Galloway submitted evidence that he was *employed* in Naperville, Illinois. *See* Decl. of John H. L'Estrange, Jr. in Supp. of Motion to Quash Galloway Trial Subpoena, Exhibit 2-September 27, 1994 Deposition of Norval Galloway, at 8 ("My office is in Naperville, Illinois at 55 Shuman Boulevard, Suite 600.").[FN1] The Magistrate would have been permitted to take judicial notice that Naperville, Illinois is over 100 miles distant from this courthouse. The Magistrate would also have been permitted to infer from this statement that Galloway *resided* over 100 miles from the courthouse. The Magistrate would not have been permitted to infer, however, that Galloway does not regularly transact business in person within 100 miles of this courthouse. Nothing in Galloway's deposition provides a basis for inferring that the nature of his employment does not regularly bring him within 100 miles of this courthouse.

FN1. This evidence was not the best evidence that could be submitted, for it requires the Court to infer that Galloway remains employed at that address despite the passage of time since the taking of the deposition. However, this inference is reasonable under the circumstances.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court notes that proof of this final fact amounts to proof of a negative: that Galloway does *not* transact business within 100 miles of the courthouse. Accordingly, even a conclusory affidavit by Galloway providing factual information from which to make this determination would suffice to shift the burden of production to the opposing party to prove the falsity of this claim. For example, if Galloway had submitted an affidavit stating the number of times, to his best recollection, that he had conducted business within 100 miles of this courthouse and a timeframe against which to compare that number, the Magistrate would have had ample evidence from which to make its determination. However, without such an affidavit, the finding that Galloway did not regularly conduct business within 100 miles of the courthouse had no factual support and was therefore clearly erroneous.

The Magistrate's Order is therefore vacated. Both parties are ordered to submit to this Court written briefs no longer than 10 pages, and further evidentiary showings, no later than April 29 at 9 a.m. The Court will rule on the matter within two days of receipt of these materials.

**IT IS SO ORDERED.**

S.D.Cal.,1996.
Regents of University of California v. Kohne
166 F.R.D. 463

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit E**
**Page 4**

# EXHIBIT  F



**C**

Bostian v. Suhor Industries, Inc.
N.D.Okla.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Oklahoma.
Jonna BOSTIAN, Plaintiff,
v.
SUHOR INDUSTRIES, INC., Tulsa Monument, Inc., and Russ Rogers, an individual, Defendant.
**No. 07-CV-151-GFK-FHM.**

Oct. 12, 2007.

Bill V. Wilkinson, Wilkinson Law Firm, Tulsa, OK, for Plaintiff.
Stephanie Terry Gentry, Marshall James Wells, Hall Estill Hardwick Gable Golden & Nelson, Tulsa, OK, for Defendant.

***OPINION AND ORDER***

FRANK H. McCARTHY, United States Magistrate Judge.
***1** The Motion to Quash of Defendant Suhor Industries, Inc. (Suhor) and John Spies [Dkt. 15] is before the undersigned United States Magistrate Judge for disposition. The matter has been fully briefed and is ripe for decision. The Motion to Quash [Dkt. 15] is GRANTED.

Mr. Spies is the Human Resource Director for Defendant Suhor. A subpoena duces tecum was served on Mr. Spies while he was in Tulsa on business for Suhor. According to Mr. Spies' affidavit, he is not an officer of Suhor. He lives in Overland Park, Kansas and works at Suhor's home office located there, although he has traveled to Oklahoma twice a year since 2003 on business. [Dkt. 15-4].

The subpoena is properly quashed under 45(c)(3)(A)(ii), which provides that a subpoena may be quashed if it:
requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person ...

Mr. Spies' home and place of employment are more than 100 miles from Tulsa, therefore since Mr. Spies is not a party nor the officer of a party he may not be summoned to Tulsa for a deposition unless he regularly transacts business in person in Tulsa. The question is whether Mr. Spies' twice yearly visits to Oklahoma to conduct business qualifies as regularly transacting business for purposes of the subpoena. The Court concludes that those infrequent visits do not qualify as regularly transacting business.

The parties did not cite any authority concerning what will qualify as regularly transacting business to sustain a subpoena. The Courts own research found little guidance. The Court considered the question in *Regents of University of California v. Kohne,* 166 F.R.D. 463 (S.D.Cal.1996) and rejected the argument that a jurisdictional analysis should be applied. The Court reasoned that a jurisdictional analysis is inappropriate for addressing Rule 45 objections because the analysis a court engages in to determine whether a party should be subject to the jurisdiction of a state responds to an entirely different set of concerns. *Id.* at 464.In considering specific or general jurisdiction, courts consider what circumstances due process would permit a state to enforce its laws over a party. Jurisdictional considerations involve determinations as to the reasonable limits of the power of the state and notice to a party that its conduct may be subject to the laws of a particular jurisdiction. In contrast, Rule 45 is concerned with the burden to a party forced to physically appear. *Id.* The Court in *Regents* determined that the language in Rule 45 should be read literally and concluded that visiting the jurisdiction ten times in seven years did not qualify as regularly conducting business for a Rule 45 subpoena. *Id.* at 465.

The undersigned is persuaded that the approach taken by the *Regents* Court is reasonable. Mr. Spies'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

twice yearly business visits to Oklahoma are not frequent enough to be considered regularly transacting business. Therefore, as a non-party he will not be required to travel here for a deposition.

*2 Defendant Suhor objects to subpoena on the basis that the documents sought are not the property of Mr. Spies. Rather, the documents belong to Suhor and have been requested from Suhor in discovery, although production is awaiting the entry of a protective order. Suhor's objection stands as an additional reason to quash the subpoena. The Court rejects Plaintiff's argument that Mr. Spies should be required to produce the requested documents because under Rule 45, regardless of ownership, he has "control" of the documents. Although the cases cited by Plaintiff define the term control as used in Rule 45, none of those cases address the situation presented here where documents belonging to the defendant corporation are subpoenaed directly from a non-party employee. Since the documents sought belong to Defendant Suhor, they are appropriately obtained directly from Suhor under Fed.R.Civ.P. 34.

Based on the foregoing, The Motion to Quash of Defendant Suhor Industries, Inc. and John Spies [Dkt. 15] is GRANTED.

SO ORDERED.

N.D.Okla.,2007.
Bostian v. Suhor Industries, Inc.
Slip Copy, 2007 WL 3005177 (N.D.Okla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit F**
**Page 2**

# EXHIBIT  G

**H**
M'Baye v. New Jersey Sports Production, Inc.
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Souleymanye M'BAYE, Plaintiff,
v.
NEW JERSEY SPORTS PRODUCTION, INC., d/b/a Main Events et al., Defendants.
**No. 06 Civ. 3439(DC).**

Oct. 25, 2007.

**Background:** Professional boxer brought action against promoter, alleging violations of Racketeer Influenced and Corrupt Organizations Act (RICO). Promoter brought contempt motion against rival promoter alleging failure to produce documents and appear for deposition in response to subpoena. Rival promoter moved to quash subpoenas.

**Holdings:** The District Court, Chin, J., held that:
(1) rival promoter was not a party despite paying boxer's legal bills, and
(2) rival promoter was not subject to subpoena.

Ordered accordingly.

West Headnotes

**[1] Federal Civil Procedure 170A 🔑1353.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)2 Proceedings
170Ak1353 Subpoena
170Ak1353.1 k. In General. Most Cited Cases
Individual subpoenaed by defendant to appear at deposition was neither a party nor an officer of a party, and, thus, could not have been compelled to travel more than 100 miles from where he resided, was employed, or regularly transacted business in person, notwithstanding that individual paid plaintiff's legal fees and had an agreement with plaintiff giving him a share of any damages award. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A 🔑1353.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)2 Proceedings
170Ak1353 Subpoena
170Ak1353.1 k. In General. Most Cited Cases
Non-party's five business trips to New York and Philadelphia within a two-year period did not qualify as regularly transacting business in person, as required for non-party to be subject to subpoena requiring him to appear at deposition in New York. Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(ii), 28 U.S.C.A.

***206** Profeta & Eisenstein, by: Jethro M. Eisenstein, Esq., New York, NY, for Plaintiff.
Orloff, Lowenbach, Stifelman & Siegel, P.A., by: Laurence B. Orloff, Esq., Samuel Feldman, Esq., Roseland, NY, for Defendant New Jersey Sports Production, Inc., d/b/a Main Events.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP, by: Robert N. Michaelson, Esq., Peter N. Flocos, Esq., New York, NY, for Frank Warren and Sports Network Ltd.

***MEMORANDUM DECISION***

CHIN, District Judge.
On April 4, 2007, defendant New Jersey Sports Productions, Inc. served non-parties Frank Warren and Sports Network Limited ("SNL") with subpoenas. Defendant filed a motion for contempt on July 23, 2007, alleging Warren's failure to produce documents and appear for a deposition in New

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

York, New York. Alternatively, defendant seeks to compel compliance with the subpoenas. Warren and SNL cross-moved on August 3, 2007 to quash the subpoenas pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(ii).

For the reasons that follow, Warren and SNL's motion to quash is granted. Plaintiff's motion for contempt, or in the alternative, to compel compliance, is denied.

### *FACTS*

Warren is a resident and citizen of the United Kingdom and Chief Executive Officer of the British corporation SNL, which promotes boxer Souleymanye M'Baye, the plaintiff in this case. (Warren Mem. 3). SNL and Warren paid M'Baye's legal fees with the agreement that plaintiff share any damages award with them. (Def.Mem. 2).

According to Warren's affidavit, he traveled on business to New York only on four occasions between November 2005 and April 2007, for a total of approximately ten days.[FN1] (Warren Ex. A). He also traveled to Philadelphia on business from June 24-27, 2005. (*Id.*). Aside from these trips, Warren, his agents, and SNL's employees, who are located in the United Kingdom, conduct business in the United States predominantly by telephone and electronic communication. (Warren Mem. 3).

> FN1. On the October 21 to 24, 2006 trip, Warren visited Florida and New York. He does not specify how many days he spent in each city, respectively. (Warren Ex. A). In any case, the maximum amount of days he could have stayed in New York during this trip is four days, which does not change the analysis.

### *DISCUSSION*

#### A. *Applicable Law*

Federal Rule of Civil Procedure 30(b)(6) provides for the deposition of a private corporation,***207** partnership, or association, including non-party organizations. When a party names such an entity in a subpoena, "the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." Fed.R.Civ.P. 30(b)(6). Furthermore, a "subpoena shall advise a non-party organization of its duty to make such a designation." *Id.*

Rule 45(c)(3)(A)(ii) sets forth the procedure to compel the attendance of non-party witnesses. It also provides protection to a non-party served with a subpoena by directing courts to "quash or modify the subpoena if it requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person." Fed.R.Civ.P. 45(c)(3)(A)(ii).

#### B. *Application*

It is undisputed that Warren is not a party or an officer of a party in this action. Defendant also does not raise the claim that SNL has failed to designate an officer, director, or other representative to testify on its behalf. Rather, defendant moves the Court to compel the deposition of Warren individually and as an officer of SNL. (Def.Mem. 3).

The two issues thus presented are (1) whether Warren's payment of M'Baye's legal fees strips him of Rule 45's protection of non-party witnesses subject to subpoenas; and (2) whether Warren's business communications with persons in New York, as well as his business travels to New York and Philadelphia between 2005 and 2007, qualify as "regularly transact[ing] business in person" for purposes of Rule 4545(c)(3)(A)(ii).

#### C. *Rule 45(c)(3)(A)(ii) Protects Warren from the Subpoena*

[1] The plain language of Rule 45(c)(3)(A)(ii) is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clear that unless a person is a party to the litigation or an officer of a party, he cannot be compelled to travel more than 100 miles from where he resides, is employed, or regularly transacts business in person. As Warren is neither a party nor an officer of a party, Rule 45(c)(3)(A)(ii) protects him from a subpoena that requires travel more than 100 miles from any place of regular business or residence.

Defendant argues, however, that Warren can be subpoenaed because he has an interest in the litigation. To demonstrate Warren's position as an interested person to the litigation, defendant points to Warren's payment of plaintiff's legal fees and agreement giving him a share of any damages award. In support, defendant cites the Second Circuit, which has explained that the "purpose of the 100 mile exception is to protect such witnesses from being subjected to excessive discovery burdens in litigation in which they have little or no interest." *In re Edelman,* 295 F.3d 171, 178 (2d Cir.2002).

It is true that Warren has demonstrated an interest in the outcome of the case, but the plain language of Rule 45(c)(3)(A)(ii) nevertheless provides that those "not a party or an officer of a party"-without exception-fall under its protection. Accordingly, Rule 45(c)(3)(A)(ii) protects Warren, as a non-party, from a subpoena requiring travel of more than 100 miles from where he resides, is employed, or regularly transacts business in person.

**D. *Warren Did Not Regularly Transact Business in New York***

[2] The second issue is whether Warren's business communications with persons in New York, as well as his five business trips to New York and Philadelphia within a two-year period qualify as regularly transacting business for purposes of the subpoena. Rule 45(c)(3) (A)(ii) specifies that one must be doing business "in person" in a given location. Therefore, business transactions that Warren conducted via telephone, email and fax between England, where his office is located, and New York does not demonstrate that New York is a place where he regularly transacts business.

Warren has also conducted business in person in New York and Philadelphia, which is within 100 miles of New York, on five different occasions. Rule 45, however, does not state with what regularity a person must transact business in a certain location to ***208** amount to a place where one regularly transacts business. But traveling to an area within a 100-mile radius for fourteen to eighteen days in two years is insufficient to render a person amenable to a subpoena. *Compare Bostian v. Suhor Industries, Inc.,* No. 07-151, 2007 WL 3005177, at *1 (N.D.Okla.2007) ("twice yearly visits to Oklahoma to conduct business ... [does] not qualify as regularly transacting business"); *and In re Application for Order Quashing Deposition Subpoenas,* No. M8-85, 2002 WL 1870084, at *3 (S.D.N.Y.2002) (a person who comes to New York for business four times within five years "does not 'regularly transact [ ] business in person' in New York to the extent contemplated by Rule 45(c)(3)(A)(ii)"); *and Regents of the University of California v. Kohne,* 166 F.R.D. 463, 465 (S.D.Cal.1996) (" 'regularity' does not mean ten times in seven years"); *with Halliburton Energy Services, Inc. v. M-I, LLC,* No. 06-53, 2006 WL 2663948, at *2 (S.D.Tex.2006) (business trips to Houston four times a year, staying approximately ten days each trip, for a period of ten years "clearly place[s a person] in the category of regularly transacting business in person").

Therefore, I conclude that Warren's infrequent visits do not qualify as regularly transacting business within the meaning of Rule 45(c)(3)(A)(ii), and as a result, he cannot be required to appear in New York for a deposition.

*CONCLUSION*

For the reasons stated above, Warren and SNL's motion to quash is granted, without fees or costs. Plaintiff's motion for contempt, or in the alternat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5 of 5

246 F.R.D. 205
246 F.R.D. 205, 69 Fed.R.Serv.3d 724
**(Cite as: 246 F.R.D. 205)**

Page 4

ive, to compel compliance, is denied, without fees or costs.

SO ORDERED.

S.D.N.Y.,2007.
M'Baye v. New Jersey Sports Production, Inc.
246 F.R.D. 205, 69 Fed.R.Serv.3d 724

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit G**
**Page 4**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

# EXHIBIT  H



Page 2 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In the Matter of the Application for an Order Quashing Deposition Subpoenas, dated July 16, 2002, served upon Takao SHIDA, Takao Sasaki, and Shuya Kojima, Non-Party Movants.
THE NISSAN FIRE & MARINE INSURANCE COMPANY, LTD., a foreign corporation, Plaintiff,
v.
FORTRESS RE, INC., a North Carolina corporation, Maurice D. Sabbah, Zmira Sabbah, Leeor B. Sabbah, and Kenneth H. Kornfeld, Defendants.
**No. M8-85.**

Aug. 14, 2002.

Japanese insurer sued American reinsurance underwriting manager in North Carolina federal court, alleging fraud. Underwriting manager asserted counter-demand for arbitration and asserted separate demand for arbitration against second Japanese insurer. During New York meeting with non-party officers of second insurer, underwriting manager served subpoenas on officers requiring appearances at New York depositions. On officers' motion to quash subpoenas and for sanctions, the District Court, Lynch, J., held that: (1) service of subpoenas was valid; but (2) District Court would quash rather than modify subpoenas based on violation of territorial limitation to subpoena rule; and (3) sanctions were inappropriate for violation of territorial limitation.

Motion to quash granted; motion for sanctions denied.

West Headnotes

**[1] Federal Civil Procedure 170A ⟹1353.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)2 Proceedings
170Ak1353 Subpoena
170Ak1353.1 k. In General. Most Cited Cases

Service of subpoenas on Japanese insurance company's officers who had traveled to New York for settlement negotiations with American underwriting manager, requiring non-party officers' appearance at New York depositions in connection with underwriting manager's arbitration demand against insurance company, was valid under civil procedure rules, regardless of officers' contention that they had been "ambushed"; subpoenas comported with requirement for proximity to issuing court and other rules provisions. U.S.C.A. Const.Amend. 5; Fed.R.Civ.P. 45(a)(2), 45(b)(2).

**[2] Federal Civil Procedure 170A ⟹1353.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)2 Proceedings
170Ak1353 Subpoena
170Ak1353.1 k. In General. Most Cited Cases

New York district court would on basis of violation of territorial limitation of subpoena rule quash rather than attempt to modify subpoenas served on Japanese insurance company's officers by North Carolina underwriting manager purporting to require New York depositions from officers, who were non-parties to underlying dispute between manager and company and who visited New York to negotiate that dispute; even if court had authority to somehow modify subpoenas to require attendance at deposition in Japan, prudential and international comity-based considerations precluded such modification, and motion to quash could not be transferred to North Carolina. Fed.R.Civ.P.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 1**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 3 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 2

, 45(b)(2), 45(c)(3)(A)(ii).

**[3] Federal Civil Procedure 170A ⚿1451**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)6 Failure to Appear or Testify; Sanctions
170Ak1451 k. In General. Most Cited Cases

Sanctions were inappropriate in response to service of deposition subpoenas on Japanese insurance company's officers by North Carolina plaintiff, accomplished when non-party officers visited New York to negotiate underlying dispute between company and plaintiff, but subsequently found to violate subpoena rule's territorial limitation; plaintiff had good faith basis for believing that officers' testimony would be relevant to underlying dispute and that subpoenas could be modified to comport with territorial limitation, and plaintiff had attempted to negotiate arrangements for depositions in good faith. Fed.R.Civ.P. 45(c)(1), 45(c)(3)(A)(ii).

Thomas F. Bush, Lovells, Chicago, IL (Marc J. Gottridge, Joseph T. McCullough IV, and Nazanin Lankarani, Lovells, New York, NY, of counsel), for Non-Party Movants.
Jack B. Gordon (Rita M. Odin, of counsel), Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for Respondents.

OPINION AND ORDER

LYNCH, District J.
*1 Non-party movants Takao Shida, Takao Sasaki, and Shuya Kojima seek (1) an order pursuant to Fed.R.Civ.P. 45(c)(3)(A)(ii) & (iv) quashing subpoenas issued in this judicial district and served on July 16, 2002, requiring their personal appearance for depositions in New York on August 15 and 16, 2002, and (2) an order pursuant to Fed.R.Civ.P. 45(c)(1) imposing sanctions upon respondents Fortress Re, Inc., Maurice D. Sabbah, Zmira Sabbah, Leeor B. Sabbah, Kenneth H. Kornfeld, and their counsel, Fried, Frank, Harris, Shriver & Jacobson, LLP, for breaching their duty to avoid imposing undue burden or expense upon the subpoena recipients. The subpoenas have been issued in connection with an action pending before the U.S. District Court for the Middle District of North Carolina, *Nissan Fire & Marine Insurance Co., Ltd. v. Fortress Re, Inc.,* No. 1:02-CV-00054 (M.D.N.C.).

Based on representations made by counsel for the movants at oral argument that Shida and Kojima have no knowledge of any facts relevant to the North Carolina action, counsel for respondents has agreed to withdraw the subpoenas served upon those two movants, leaving before the Court only the motion to quash as to the subpoena served upon Sasaki and the motion for sanctions. For the reasons that follow, the motion to quash will be granted, but the motion for sanctions will be denied.

BACKGROUND

The action pending in North Carolina concerns a dispute between plaintiff Nissan Fire and Marine Insurance Co., Ltd. ("Nissan"), a Japanese corporation, and defendants Fortress Re, Inc. ("Fortress Re"), a reinsurance underwriting manager based in North Carolina, and the individual defendants, who are all directors, officers, or shareholders of Fortress Re. (Drew Decl. ¶¶ 3-4.) Since 1972, Fortress Re has served as managing underwriting agent for a group of several Japanese insurance companies, which in recent years has included Nissan, Taisei Fire and Marine Insurance Co., Ltd. ("Taisei"), and Aioi Insurance Co., Ltd. ("Aioi"). (Drew Decl. ¶¶ 4-5.) All three of these Japanese companies are now involved in disputes with Fortress Re arising from the termination of their respective management agreements with Fortress Re. (Drew Decl. ¶¶ 8-9.) Nissan initiated the North Carolina action and an arbitration proceeding against Fortress Re and the individual defendants, alleging, *inter alia,* that the respondents engaged in fraud and misrepresentation when disclosing information to Nissan. Fortress Re

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H
Page 2**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 4 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

has served Nissan with a counter-demand for arbitration and has served Aioi with a separate demand for arbitration. (Drew Decl. ¶ 9; Juceam Decl. ¶¶ 2-3.) Taisei and Aioi are not parties to the North Carolina action filed by Nissan, but respondents maintain that testimony from Aioi's officers and employees is relevant to Fortress Re's defense of the North Carolina action because a significant issue in that dispute concerns whether Nissan had knowledge of Fortress Re's practices and understood its disclosures. According to respondents, Nissan. Taisei, and Aioi received substantially identical information from the respondents and discussed that information amongst themselves, making Aioi employees a source of substantial, material evidence to their defense of the North Carolina action. (Drew Decl. ¶ 4; Juceam Decl. ¶ 4.)

*2 Sasaki is a citizen and resident of Japan and is General Manager of Aioi's Reinsurance Department. While Aioi has a New York office, Sasaki maintains that he does not regularly work out of that office and has only come to New York for business four times within the past five years.[FN1](Sasaki Decl. ¶¶ 2, 4-5.) One of those instances, however, was a trip to New York to attend a meeting held with representatives of Fortress Re on July 16, 2002, for the purpose of discussing Aioi's own potential claims against Fortress Re and the possibility of settling their disputes. Shida and Kojima accompanied Sasaki to that meeting, which was held in New York, rather than North Carolina, at the request of the three Aioi employees and for their convenience. (Juceam Decl. ¶¶ 6-8; Sasaki Decl. ¶¶ 6-7; Kojima Decl. ¶¶ 6-7; Shida Decl. ¶¶ 6-7.) The meeting did not, however, result in any settlement of the dispute between Fortress Re and Aioi, and at the end of the meeting, counsel for Fortress Re asked counsel for the movants to accept service of subpoenas seeking their appearance for depositions in New York on August 15 and 16, 2002. While counsel for the movants vigorously objected to service of the subpoenas, the movants ultimately accepted service under protest, without agreeing that service was proper and expressly reserving their rights to challenge those subpoenas. (McCullough Decl. ¶ 9; Sasaki Decl. ¶ 9; Kojima Decl. ¶ 9; Shida Decl. ¶ 9; Juceam Decl. ¶¶ 9-10.)

FN1. By contrast, respondents maintain that Sasaki has traveled to North Carolina at least six times within the past ten months for the purpose of discussing Aioi's business with Fortress Re. (Drew Decl. ¶ 13.)

Subsequent attempts to work out an amicable resolution concerning the movants' depositions were unsuccessful. (Juceam Decl. ¶¶ 11-12.) This motion followed and was heard before this Court as a miscellaneous application on August 8, 2002.

## DISCUSSION

### I. Motion to Quash Subpoena

[1] Under Rule 45(a)(2) of the Federal Rules of Civil Procedure, a subpoena for attendance at a deposition must issue from the court for the district in which the deposition is to be taken. Fed.R.Civ.P. 45(a)(2).Rule 45(b)(2) authorizes service of such a subpoena (1) "at any place within the district of the court by which it is issued," (2) at any place outside the district "that is within 100 miles of the place of the deposition, hearing, trial, production, or inspection specified in the subpoena," or (3) "at any place within the state" if state law authorizes statewide service of a subpoena "issued by a state court of general jurisdiction sitting in the place of the deposition, hearing, trial, production, or inspection specified in the subpoena."Fed.R.Civ.P. 45(b)(2).

Service of the subpoenas in this case properly complied with both of these requirements, since the subpoenas sought the movants' appearance for depositions in New York and were personally served upon the movants within this district. While the movants protests that service upon the movants was improper because they were "ambushed" with service after being "induced" by the respondents to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 3**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 5 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

come all the way from Japan to New York for the express and sole purpose of engaging in settlement negotiations with Fortress Re (Movants Br. 3-4), the Court finds no basis to conclude that the movants were in any way privileged or immunized-whether on account of the transient nature of their sojourn to New York or the purpose for which they made that trip-from service of process in this judicial district. *See, e.g., Kadic v. Karadzic,* 70 F.3d 232, 246-47 (2d Cir.1995) (upholding exercise of personal jurisdiction over citizen of foreign country visiting New York for purpose of addressing United Nations). The movants fully "knew, or should have known, that by" attending the meeting in New York, they were also "risking exposure to personal jurisdiction in New York."*First Am. Corp. v. Price Waterhouse LLP,* 154 F.3d 16, 20-21 (2d Cir.1998) (citing *Burnham v. Superior Court,* 495 U.S. 604, 635, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)). Given that an individual may be subjected to liability by the exercise of so-called "tag" jurisdiction far from home without the Due Process Clause being violated, there is no reason why service of a subpoena under Rule 45(b)(2), "which is simply a discovery mechanism and does not subject a person to liability, requires more."*In re Edelman,* 295 F.3d 171, 179 (2d Cir.2002); *see First Am. Corp.,* 154 F.3d at 20. As for the "ambush" argument, while the movants make much rhetorically of this claim, they in fact make no legal argument, and cite no authority, for the proposition that persons engaged in business discussions relating to the settlement of a dispute may not be served with process. Actual service of the subpoenas upon the movants, therefore, itself raises no legal question.

***3** [2] However, the authority to serve a subpoena under Rule 45(b)(2) also is explicitly made "subject to the provisions of" Rule 45(c)(3)(A)(ii), which provides that upon a timely motion,

> the court by which a subpoena was issued *shall* quash *or* modify the subpoena if it ... requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person.

Fed.R.Civ.P. 45(c)(3)(A)(ii) (emphasis added). The purpose of the territorial limitation "is to protect [non-party] witnesses from being subjected to excessive discovery burdens in litigation in which they have little or no interest."*Edelman,* 295 F.3d at 178;*see Price Waterhouse LLP v. First Am. Corp.,* 182 F.R.D. 56, 63 (S.D.N.Y.1998). Non-party witnesses also are protected from being held in contempt for failure to obey subpoenas that purport to require them to attend depositions at places outside the territorial limits of Rule 45(c)(3)(A)(ii). Fed.R.Civ.P. 45(e).[FN2]

> FN2. Arguably, given Rule 45(c)(3)(A)(ii), the movants could have simply ignored the subpoenas, rather than moving to quash them, without fearing any contempt sanction from this Court on account of their noncompliance. *See*Fed.R.Civ.P. 45(e). Understandably and appropriately, however, they have sought to have their obligations adjudicated in advance, rather than defying the subpoenas and asserting defenses in a contempt proceeding.

It is undisputed that Sasaki, who lives and works in Japan, would be required to travel more than 100 miles from their place of residence and employment in order to be deposed in New York. It also seems perfectly clear that Sasaki does not "regularly transact[ ] business in person" in New York to the extent contemplated by Rule 45(c)(3)(A)(ii).[FN3]*See Regents of University of California v. Kohne,* 166 F.R.D. 463, 465 (S.D.Cal.1996) (under Fed.R.Civ.P. 45(c)(3)(A)(ii), " 'regularly' does not mean ten times in seven years").

> FN3. Respondents emphasize Sasaki's extensive contacts in North Carolina in connection with Aioi's business relationship with Fortress Re, noting that he made at least six trips to North Carolina within the past ten months. (Drew Decl. ¶ 13.) While those contacts may or may not support the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 4**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 6 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

> conclusion that Sasaki "regularly transact[s] business in person" in North Carolina under Rule 45(c)(3)(A)(ii), they are simply irrelevant to whether he does so in New York.

What is not altogether clear, however, is the effect that should be given to the cross-referencing language making Rule 45(b)(2) "subject to" the provisions of Rule 45(c)(3)(A)(ii), for that language is, to say the least, somewhat ambiguous. *See* David B. Siegel, *Federal Subpoena Practice Under the New Rule 45 of the Federal Rules of Civil Procedure,* 139 F.R.D. 197, 209 (1992) ("In some situations when one consults Rule 45 for guidance about the territorial reach of a subpoena and starts to hop back and forth among [Rule 45's various subsections], the rule comes off like a Tower of Babel, an inferno with shrill voices jabbering simultaneously in a confusion of tongues."). Sasaki argues that a subpoena that transgresses the territorial limitations set forth in Rule 45(c)(3)(A)(ii) is invalid *ab initio,* and accordingly that the Court *must* quash the subpoena as beyond the authority conferred in Rule 45(b)(2) to serve it. By contrast, respondents maintain that the cross-referencing language making Rule 45(b)(2) "subject to" the provisions of Rule 45(c)(3)(A)(ii) does not *automatically* render a subpoena invalid if it exceeds those territorial limitations, but instead vests discretion in the district court, as provided in the latter rule, either to quash *or* modify the subpoena when presented with a timely motion for relief by the subpoena recipient. On respondents' reading of Rule 45(b)(2), the court still must do *something* when faced with the circumstances described in Rule 45(c)(3)(A)(ii) and presented with a timely motion-given the mandatory language of the rule, which states that the court "*shall* quash or modify" the subpoena, the court cannot simply let such a subpoena stand as issued. At the same time, quashing the subpoena is not the only option available to the court. Rather, at its discretion, the court is permitted either to quash *or* to modify the subpoena as the circumstances warrant. On this view, Rule 45 permits a party to serve a subpoena that cannot be enforced according to its terms, "subject to" later modification (or quashing) of the subpoena.

*4 The parties draw our attention to only a handful of cases involving circumstances akin to those presented here. For example, in *Matthias Jans & Assocs., Ltd. v. Dropic,* No. 01-MC-26, 2001 WL 1661473 (W.D.Mich. Apr.9, 2001), the court concluded that the movant was entitled to relief from a subpoena issued in Western District of Michigan and served upon a resident of that district in connection with an action pending in the Northern District of Ohio, since the subpoena sought the appearance of the movant for a deposition in Cleveland, Ohio-a location outside the territorial restrictions set forth in Rule 45(c)(3)(A)(ii). Rather than quashing the subpoena altogether, however, the court ordered that the subpoena be modified to require its recipient to appear for the deposition "at a place to be agreed upon by all counsel, no greater than 100 miles" from her residence. *Id.* at *3. Similarly, in *Comm-Tract Corp. v. Northern Telecom, Inc.,* 168 F.R.D. 4, 7 (D.Mass.1996), the court modified a subpoena issued and served in Massachusetts upon a non-party witness who, by the time scheduled for his appearance at trial, was to have commenced work on a three-year expatriate assignment in Hong Kong, concluding that the "just result" was to modify the subpoena to require the witness to submit to a videotape deposition in Hong Kong. By contrast, in *St. Paul Fire & Marine Insurance Co. v. Royal Insurance Co.,* No. 91 Civ. 6151(PNL), 1993 WL 267347, (S.D.N.Y. July 12, 1993), the court stated that "Rule 45(c)(3)(A)(ii) appears to *require* the quashing of a subpoena if it requires a person who is neither a party nor an officer of a party to travel to a place more than 100 miles from his or her residence or place of business to testify," and on that basis quashed the subpoena. *Id.* at *1 (emphasis added); *cf. Price Waterhouse LLP v. First Am. Corp.,* 182 F.R.D. 56, 63-64 (S.D.N.Y.1998) (concluding that the court could not modify a subpoena that sought the appearance of residents of England for a deposition in New

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 5**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 7 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

York to provide instead that the deposition take place in London because such a modification would "create a subpoena that *does not* issue from 'the district in which the deposition is to be taken," ' in violation of Rule 45(a)(2)).

Plausible policy arguments support both readings. It seems peculiar to permit a party to serve a subpoena that is unenforceable according to its terms. On the other hand, it is not uncommon that non-jurisdictional defects may be waived if they are not asserted, and the rule may contemplate the possibility of securing jurisdiction over a witness who is otherwise difficult to locate or serve, leaving it to later court action-if sought by the witness-to achieve a fair result. Given that the rule expressly authorizes the Court to quash *or* modify the subpoena, it seems equally odd to conclude that the sensible results ordered by the courts in *Matthias Jans* and *Comm-Tract* were simply unauthorized by law.

*5 Nevertheless, the Court need not resolve in this case whether Rule 45(b)(2) requires that a subpoena in violation of Rule 45(c)(3)(A)(ii) be quashed or confers discretion upon the court to modify such a subpoena. Assuming, without deciding, that Rule 45(b)(2) permits a court to modify a subpoena whose enforcement would violate Rule 45(c)(3)(A)(ii), on the facts of this case the Court would in any event exercise its discretion to quash, rather than modify, the subpoena served upon Sasaki.

[3] It is not clear that the Court can fashion a modification to the subpoena that would both satisfy the requirements of Rule 45(c)(3)(A)(ii) and be appropriate to the particular circumstances presented here. As already noted, even on respondents' interpretation of Rule 45, the Court cannot order Sasaki to appear for a deposition here in New York-the Court must either "quash or modify" that deposition. The only plausible modification that would bring the subpoena into compliance with Rule 45(c)(3)(A)(ii) would change the location of the deposition from New York to Tokyo. Were Sasaki a resident of another judicial district in the United States, that approach might seem an altogether sensible, appropriate, and straightforward exercise of this Court's discretion to "quash or modify" the subpoena. *See Matthias Jans,* 2001 WL 1661473, at *2-*3.

In this case, however, modifying the subpoena to require attendance at a deposition in Japan would be a more complicated endeavor. Japanese law authorizes a deposition in Japan for use in U .S. courts only if (1) the witness or party is willing to be deposed, (2) the deposition takes place on U.S. consular premises, (3) a consular officer presides over that deposition, pursuant either to a letter rogatory issued by a U.S. court or to a court order (for example, under the All Writs Act, 28 U.S.C. § 1651) that specifically authorizes a U.S. consular officer to take the deposition on notice, and each participant traveling from the United States to Japan to participate in the deposition obtains a "deposition visa." Resp. Ex. C. (circular on obtaining evidence in Japan issued by U.S. Department of State); *see* Consular Convention and Protocol, Mar. 22, 1963, U.S.-Japan, art. 17(1)(e)(ii), 15 U.S.T. 768; Fed.R.Civ.P. 28(b); 22 C.F.R. §§ 92.49-92.71.[FN4]Respondents are perfectly aware of these procedures-indeed, they characterize the burdens of these procedures as one of the reasons why the motion to quash should be denied, arguing that they are "not likely to be able to obtain satisfactory discovery" from Sasaki unless he is deposed in the United States or, in respondents' paradoxical phrase, is "required to consent" to his deposition in Japan. (Resp.Br.13.) It is not clear, however, that the authority granted in Rule 45(c)(3)(A)(ii) to modify a subpoena extends to the kinds of "modifications" that would be required to permit the subpoena to comply with these requirements by functioning as the equivalent of a letter rogatory or a court order authorizing a U.S. consular officer to take the deposition. Even less clear is how this Court would be able to modify the subpoena, as the respondents suggest, so as to "require" Sasaki to "consent" to his deposition in Japan.[FN5]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 6**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 8 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

FN4. Japan is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 847 U.N.T.S. 231, and accordingly, the "letter of request" procedures under that convention are not available to the respondents.

FN5. Tellingly, while the respondents argue vigorously that the Court has the authority to modify the subpoena served upon Sasaki, they finesse the question of what *particular* modifications the Court should make to that subpoena.

*6 But even if such authority did exist under Rule 45, prudential, international comity-based considerations counsel that the Court refrain under the circumstances of this case. "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position."*Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *see also In re Chase Manhattan Bank,* 297 F.2d 611, 613 (2d Cir.1962) (modification of subpoena directing production of documents located in Panama is appropriate where compliance would necessitate violation of Panamanian law); *Ings v. Ferguson,* 282 F.2d 149, 152 (2d Cir.1960) ("Upon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."); *Laker Airways, Ltd. v. Pan American World Airways,* 607 F.Supp. 324, 326 (S.D.N.Y.1985) (quashing subpoenas seeking depositions of non-party witnesses where service of the subpoenas in New York constitutes "a transparent attempt to circumvent the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters"). The Court in the best position to exercise such supervision is not this Court, which merely has jurisdiction over the subpoena issued on its behalf, but the district court in North Carolina before which the underlying action itself is pending. This Court may not transfer the instant motion to quash to the North Carolina court, since "only the issuing court has the power to act on its subpoenas."*In re Sealed Case,* 141 F.3d 337, 341 (D.C.Cir.1998) (reversing D.C. district court's transfer of motion to quash subpoena and cross-motion to compel to district court in Arkansas). However, the respondents remain perfectly free to seek from the North Carolina court a letter rogatory or an order authorizing consular officials to preside over the deposition of Sasaki and any other witnesses in Japan whose testimony might be relevant to this action.

If these various considerations counseling against modification of the subpoena might be overcome in some unusual circumstances by a compelling need of a party to obtain discovery, this case presents no such circumstances. As an officer of Aioi, Saskai has no direct knowledge of the facts at issue between Nissan and Fortress Re in the pending litigation; the testimony he could provide would at best constitute indirect evidence on the issues in that case. Nor is it clear that Sasaki personally is the best source of information about Fortress Re's contacts with Aioi; neither party to this motion has addressed the potential for serving a Rule 30(b)(6) deposition or other discovery demand on Aioi in North Carolina. As for Fortress Re's dispute with Aioi, that dispute is apparently under arbitration, and the arbitrators will have ample power to determine what discovery is necessary in that matter.

*7 Accordingly, it is not necessary to resolve the various questions raised by this motion concerning the interpretation of Rule 45. "When it is necessary to seek evidence abroad," prudential considerations of international comity require the district court "to supervise pretrial proceedings particularly closely to prevent discovery abuses."*Aerospatiale,* 482

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 7**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008

Page 9 of 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

U.S. at 546. This Court is ill placed to play that supervisory role, given its limited knowledge of the underlying case. Thus, the motion to quash will be granted without prejudice to an application by the respondents to that court for a letter rogatory or other appropriate order relating to discovery from Aioi or Sasaki.

II. Motion for Sanctions

Rule 45(c)(1) of the Federal Rules of Civil Procedure obligates a party or attorney responsible for the issuance and service of a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena," and requires the court on whose behalf the subpoena is issued to "enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee."Fed.R.Civ.P. 45(c)(1).

Sanctions are not appropriate under the circumstances of this case. Issuance and service of the subpoenas upon the movants was not itself in any way improper, since the respondents had a good faith basis for believing that the movants' testimony would be relevant to the North Carolina action, and as the above discussion shows, there are legitimate questions concerning the effect of Rule 45(c)(3)(A)(ii) on this case. Moreover, subsequent to the issuance of the subpoenas, respondents and their counsel have negotiated in good faith to make any accommodations necessary with respect to time, location, or both in order to ease the potential burden that appearance for the deposition would present to the movants. While the movants argue that "an attempt to enforce a supboena that violates the mandatory provisions of Rule 45(c)(3) is a *per se* violation of the Rule 45(c)(1) duty," Movants Br. 7 (quoting *Matthias Jans & Assocs.,* 2001 WL 1661473, at *3), the Court cannot conclude that at the time the subpoenas were served, the respondents lacked a good faith belief that the subpoenas were properly served. The various questions concerning the proper interpretation of the territorial restrictions set forth in Rule 45(c)(3)(A)(ii) have not yet been addressed by many courts, let alone definitively resolved. It would seem appropriate, therefore, that the difficult "questions about [the rule's] territorial range ... should have definitive answers from decisional law before attorneys who must guess at the answers start getting sanctioned for guessing wrong."Siegel, *supra,* 139 F.R.D. at 227-28.

Since the respondents have heeded their obligation to "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena,"Fed.R.Civ.P. 45(c)(1), the motion for sanctions will be denied.

CONCLUSION

***8** For the foregoing reasons, the motion to quash the subpoena served upon Sasaki is GRANTED. The motion for sanctions pursuant to Fed.R.Civ.P. 45(c)(1) is DENIED.

SO ORDERED.

S.D.N.Y.,2002.
In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002
Not Reported in F.Supp.2d, 2002 WL 1870084 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**
**Page 8**

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split... 3/31/2008